**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**J. BENJAMIN GREENBERG,**[1] derivatively on behalf of **CIRCLE INTERNET GROUP, INC.,**

Plaintiff,

v.

**DONALD J. TRUMP,** in his official capacity as President of the United States;

**WORLD LIBERTY FINANCIAL LLC** (f/k/a WORLD LIBERTY FINANCIAL, INC.);

**WLF HOLDCO LLC;**

**STABLECOIN HOLDCO LLC;**

**DT MARKS DEFI LLC;**

**DT MARKS SC LLC; and**

**STEVEN C. WITKOFF,** in his official capacity as United States Special Envoy to the Middle East;

Defendants,

and

**CIRCLE INTERNET GROUP, INC.**,

Nominal Defendant.

Civil Action No. [_______]
Jury Trial Requested

**VERIFIED COMPLAINT**

This action is about the President of the United States corruptly profiting from more than $2 billion in payments from a foreign government in direct violation of the Constitution. No president in American history has profited from his office so brazenly. Nor has this President tried

[1] Pursuant to Local Civil Rule 5.1(c)(1), the Plaintiff's residential address is being filed under seal with the Court in a separate Notice of Filing.

to hide his corruption: the conduct alleged below is a matter of public record. The President himself has openly admitted that the lack of consequences emboldens him, not only to continue using his high office to enrich himself, but to expand the fortune he is extracting from the trust the American people placed in him. Using the presidency for personal profit is not only unethical. It is not only a matter of grave concern to millions of Americans. It is illegal, and it is a clear violation of the Constitution President Trump swore to protect.

This is an action to seek redress for some of the corrupt and illegal acts of the President and his related companies.

First, this is an action to redress the unlawful sale of a stake in President Trump's cryptocurrency company to a foreign actor. Before assuming office, the President agreed to sell a portion of his family's cryptocurrency company in exchange for $500 million routed from the United Arab Emirates ("UAE"). Millions of dollars from that deal, routed from a foreign government, flowed to President Trump after he assumed office.

Second, this is an action to redress the unlawful purchase of $2 billion in President Trump's stablecoin. Weeks after President Trump took office, an investment fund created by the UAE government orchestrated a scheme to inflate the value of President Trump's crypto holdings by purchasing $2 billion in the President's brand-new digital currency. The corrupt purchase handed President Trump millions of dollars in interest and dramatically expanded the circulation of his stablecoin overnight.

By accepting hundreds of millions of dollars from a foreign government, the President and his companies have diverted business from Circle Internet Group, Inc. ("Circle"). Plaintiff J. Benjamin Greenberg ("Plaintiff") brings this action on behalf of Circle to hold the President and

five of his related companies accountable for accepting presents and emoluments from a foreign State in violation of the Constitution and laws of this District.

Plaintiff asks this Court to declare the President's corrupt acts a violation of the Constitution, to enjoin the brazen corruption alleged below, to order an accounting of the billions in payments from foreign states to the President and his businesses, to require the companies holding them to disgorge the emoluments the President accepted through them, and for compensatory and punitive damages. In support of this action against Defendants Donald J. Trump, World Liberty Financial LLC (formerly known as World Liberty Financial, Inc.) ("World Liberty" or "WLF"), WLF Holdco LLC ("WLF Holdco"), Stablecoin Holdco LLC ("Stablecoin Holdco"), DT Marks DEFI LLC ("DT Marks DEFI"), DT Marks SC LLC ("DT Marks SC"), and Steven C. Witkoff ("Steve Witkoff"), in his official capacity as United States Special Envoy to the Middle East, Plaintiff alleges as follows:

## INTRODUCTION

1. This case seeks relief and redress from the President for taking money from a foreign government in violation of the United States Constitution and the illegal acts of the President's related companies.

2. The corruption at issue is not subtle, and it is not hidden. Since returning to office, President Donald J. Trump and his family have built a cryptocurrency business and invited foreign states to route money to him by paying into it. Foreign money has answered.

3. On the eve of the inauguration, a member of the ruling family of the UAE, who also serves as that country's national security adviser, agreed to pay $500 million through an investment vehicle he backs for a 49% stake in the President's crypto business, World Liberty. The President has accepted millions from that deal since assuming office.

4. Months later, an investment fund created by the government of Abu Dhabi—the capital and one of the seven emirates of the UAE—gave $2 billion to the President through World Liberty's brand-new digital currency, USD1, turning a crypto product that the President's crypto business had created just weeks earlier into one of the largest of its kind. According to the Wall Street Journal, the Emirati purchase constitutes "a foreign government official purchasing a major stake in a Trump company after his election."[2]

5. The President has profited enormously. Billions of dollars have flowed to companies he controls, and his own certified financial disclosures report more than $1 billion in income from cryptocurrency ventures in 2025 alone. And the profits have not stopped.

6. The multi-billion-dollar investment has also significantly fueled the value of the President's cryptocurrency offerings. And for as long as the foreign government's money sits in the family's digital currency, the family's business earns interest on it.

7. That course of conduct alone violates the Constitution. But the corrupt acts arising from these relationships did not stop there. While foreign government money poured into the President's family business, the President and his administration have made decisions of enormous value to that same foreign government, as well as to the President's own company: access to the most advanced American technology, a pardon for a convicted felon close to the Emirati leadership, and federal approval for a bank charter for the family's crypto business. While the White House has repeatedly stated there are "no conflicts of interest,"[3] the President has been more

---

[2] Sam Kessler, Rebecca Ballhaus, Eliot Brown & Angus Berwick, *'Spy Sheikh' Bought Secret Stake in Trump Company*, Wall St. J. (Jan. 31, 2026), https://www.wsj.com/politics/policy/spy-sheikh-secret-stake-trump-crypto-tahnoon-ea4d97e8.
[3] *Id.*

candid. Asked why he had abandoned restraints he observed in his first term, he answered: "Because I found out that nobody cared. I'm allowed to."[4]

8. But the Constitution does not allow it. Although the President has dressed his corrupt arrangements in the language of new technology—tokens and stablecoins, holding companies and reserve yields—that vocabulary must not obscure what this is: the oldest form of public corruption, a public official taking money from a foreign power.

9. The Constitution forbids it in plain terms. No person holding federal office, the President above all, may accept "any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State" without the consent of Congress.[5]

10. Congress has not consented.

11. These payments by the UAE to the Trump family have done concrete harm to Circle and its shareholders, including Plaintiff. Circle is an American crypto company and competitor of World Liberty. It issues its own stablecoin called USDC. As of June 30, 2026, $73.3 billion worth of USDC was in circulation. Circle makes its money the same way World Liberty makes money: by earning interest on the reserves that back its coins. In 2025, reserve income accounted for approximately 96% of Circle's total revenue and reserve income. Simply put: every dollar of stablecoin steered to the President's stablecoin, USD1, is a dollar that does not earn reserve income for Circle.

12. With foreign governments funneling money into World Liberty to win the President's favor, Circle is left unable to compete. The President's USD1 stablecoin offers foreign

---

[4] *Interview with Zolan Kanno-Youngs, Tyler Pager, Katie Rogers, and David E. Sanger of the New York Times*, Am. Presidency Project (Jan. 7, 2026), https://www.presidency.ucsb.edu/documents/interview-with-zolan-kanno-youngs-tyler-pager-katie-rogers-and-david-e-sanger-the-new-york.
[5] U.S. Const. art. I, § 9, cl. 8.

governments something that Circle's stablecoin never can: the opportunity, by enriching the President, to obtain favorable treatment from the President and his administration. That is a competitive injury to Circle, caused by the President's acceptance of unconstitutional emoluments, and it is redressable by this Court.

13. Circle's Board of Directors (the "Circle Board") has not acted to protect the Company from this injury, nor can its shareholders reasonably expect they will do so—regardless of the severity or ongoing nature of the economic damage wrought by this ongoing corrupt scheme by the President. The clear entwinement by Circle's Directors with the President's political and corrupt operations, paired with the constant threat of retaliation posed by the President to any crypto competitor daring to defy his systemic profiteering through his crypto business, means that any demand to Circle's Board of Directors to take action to seek redress for Circle from the President's unconstitutional conduct would be futile.

14. Plaintiff therefore brings this action on Circle's behalf. He seeks a declaration that the President's acceptance of these emoluments violates the Constitution, an injunction against their continued acceptance without the consent of Congress, an accounting and disgorgement of the emoluments the President has received, and damages for Circle from the entities through which the emoluments were paid.

## PARTIES

15. Plaintiff is a resident of Jefferson County, Colorado. Mr. Greenberg is a software engineer who was employed by Circle from January 2016 through September 2018. During his employment, Mr. Greenberg received Circle equity as part of his compensation package, including an option to purchase ordinary shares of Circle Internet Financial Limited, Circle's Irish predecessor, under a Share Award Agreement dated February 3, 2016. On December 4, 2018, Mr.

Greenberg exercised that option as to 10,000 ordinary shares, at an exercise price of $0.79 per share. Mr. Greenberg held Circle shares at the time of Circle's initial public offering in June 2025.

16. On July 1, 2024, through an arrangement approved by the Irish High Court, the ordinary shares of Circle Internet Financial Limited were cancelled and Circle Internet Group, Inc., a Delaware corporation, issued an equivalent number of shares of its capital stock of the same class to the former shareholders of Circle Internet Financial Limited, including Mr. Greenberg. Mr. Greenberg has held Circle stock continuously since that date, including at the time of each transaction complained of in this Complaint. He currently holds 10,000 shares of Circle Class A common stock. He will continue to hold Circle stock throughout the pendency of this action.

17. Mr. Greenberg is a stockholder who fairly and adequately represents the interests of Circle and its stockholders in enforcing Circle's rights. He has retained counsel experienced in complex federal litigation, including constitutional litigation.

18. Nominal Defendant Circle Internet Group, Inc. is a Delaware corporation with its principal executive offices at One World Trade Center, New York, New York 10007. Circle's Class A common stock trades on the New York Stock Exchange under the symbol "CRCL." Circle Internet Group, Inc. is the publicly traded parent of the Circle group. Its wholly owned subsidiaries, Circle Internet Financial, LLC and Circle Internet Financial Europe SAS, issue USDC, a United States dollar stablecoin. Unless the context indicates otherwise, references in this Complaint to "Circle" include Circle Internet Group, Inc. and its consolidated subsidiaries, which report Circle's revenue, reserve income, and USDC in circulation on a consolidated basis. Circle is named as a nominal defendant solely in a derivative capacity; this action is brought on its behalf, and no claims are asserted against it.

19. Defendant Donald J. Trump is the President of the United States. He took office on January 20, 2025. He is sued in his official capacity for declaratory relief, injunctive relief, and equitable relief, including a related accounting, disgorgement, and the imposition of a constructive trust. Disgorgement and a constructive trust are sought only against the Private Company Defendants (as defined below), which hold the emoluments. World Liberty has at various times identified President Trump as its "Co-Founder Emeritus" and as its "Chief Crypto Advocate."

20. President Trump holds his interests in World Liberty through the Donald J. Trump Revocable Trust, dated April 7, 2014 (the "Trust"), of which he is "presently the sole beneficiary." The Trust owns 99% of DJT Holdings LLC (and the remaining 1% through a wholly owned managing member). DJT Holdings LLC owns 99% of DTTM Operations LLC. DTTM Operations LLC owns 69% of each of DT Marks DEFI and DT Marks SC (together, "the DT Marks companies"), and a further 1% of each is held by a member corporation that the Trust wholly owns through intermediate entities. Upon information and belief, the DT Marks companies have no business other than holding the President's and his family's interests in World Liberty and its stablecoin business and receiving payments from that business, including the payments alleged in this Complaint.

21. Defendant World Liberty is a Florida limited liability company with its principal place of business in Miami, Florida. World Liberty owns and controls the USD1 stablecoin brand, together with its affiliate SC Financial Technologies, LLC, and issues the WLFI governance token. USD1 tokens are minted and redeemed by BitGo, a regulated custodian, under a "stablecoin-as-a-service" arrangement, and the reserves backing them are held by BitGo. The President's financial disclosure reports that proceeds of World Liberty token sales were "distributed by World Liberty Financial LLC." For much of the time covered by the allegations in this Complaint, World Liberty

operated as World Liberty Financial, Inc., a Delaware nonstock corporation owned by WLF Holdco. On January 20, 2026, World Liberty filed a conversion with the Florida Division of Corporations to change from a Delaware corporation into a Florida limited liability company.

22. Defendant WLF Holdco is a Delaware limited liability company based in Miami, Florida. WLF Holdco holds the only membership interest in World Liberty. DT Marks DEFI owns 38.25% of WLF Holdco; third parties own the remaining 61.75%. Upon information and belief, no member of WLF Holdco is a citizen of the District of Columbia.

23. WLF Holdco's role extends beyond holding World Liberty's membership interest. The President's annual financial disclosures identify WLF Holdco as holding assigned economic rights to World Liberty's non-token revenues under service agreements with World Liberty's founders. Upon information and belief, WLF Holdco negotiated and executed those service agreements in whole or in part in the District. WLF Holdco is named as a relief Defendant.

24. Public securities filings identify persons exercising management authority over WLF Holdco. ALT5 Sigma Corporation's February 3, 2026, proxy identifies Zachary ("Zach") Witkoff and Zachary ("Zak") Folkman as members of WLF Holdco's three-person board of managers. It states that the managers share voting and disposition authority over securities held by World Liberty, and that no individual manager has unilateral authority over those securities. A separate public disclosure has identified Eric Trump as a manager of WLF Holdco.

25. Defendant DT Marks SC is a Delaware limited liability company, based in Jupiter, Florida. The President controls DT Marks SC through the Trust. DT Marks SC owns 38.25% of Defendant Stablecoin Holdco. In 2025, DT Marks SC received over $196 million in net proceeds from capital contributed by new members of Stablecoin Holdco and the sale of Class C units of Stablecoin Holdco, a portion of which is attributable to the Aryam transaction described below. Its

interest in Stablecoin Holdco also carries a share of the stablecoin business's net operating income, which was over $8 million in 2025. DT Marks SC is named as a relief defendant.

26. Defendant DT Marks DEFI (formerly DT Tower II LLC) is a Delaware limited liability company, based in Jupiter, Florida. The President controls DT Marks DEFI through the Trust. DT Marks DEFI owns 38.25% of WLF Holdco and has been entitled to 75% of the proceeds of World Liberty token sales, net of expenses. In 2025, DT Marks DEFI received $526,810,321 in proceeds from World Liberty token sales and $65,625,000 in net proceeds from the sale of equity in WLF Holdco, a portion of which is attributable to the Aryam transaction described below. DT Marks DEFI is named as a relief defendant.

27. Defendant Stablecoin Holdco is a Delaware limited liability company based in Miami, Florida, whose underlying asset is World Liberty's stablecoin business. DT Marks SC owns 38.25% of Stablecoin Holdco; third parties own the remaining 61.75%. In connection with the Aryam transaction described below, Stablecoin Holdco admitted new members and sold Class C units of Stablecoin Holdco, providing the more than $196 million in proceeds that DT Marks SC reported in 2025. Stablecoin Holdco is named as a Defendant on the claims for unjust enrichment and unfair competition and as a relief defendant on the equitable claims.

28. Defendant Steven C. Witkoff is the United States Special Envoy to the Middle East. He began serving as the President's envoy in January 2025 and was formally sworn in on May 6, 2025. He co-founded World Liberty with his son, Zach Witkoff, and members of the Trump family, and in 2025 received nearly $107 million in income from a holding company affiliated with World Liberty. He is sued in his official capacity for injunctive relief.

29. World Liberty and Stablecoin Holdco are referred to collectively as the "World Liberty Defendants." World Liberty is named as a Defendant on each of the state-law claims

asserted below, and Stablecoin Holdco is named as a Defendant on Plaintiff's claims for unjust enrichment and unfair competition. The World Liberty Defendants, WLF Holdco, DT Marks DEFI, and DT Marks SC are referred to collectively as the "Private Company Defendants." Each Private Company Defendant is named as a relief defendant on the equitable claims, so that complete relief, including an accounting, disgorgement, and the imposition of a constructive trust, may be had against the persons and entities holding the emoluments at issue. WLF Holdco, DT Marks DEFI, and DT Marks SC are named only as relief defendants.

## JURISDICTION AND VENUE

30. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution of the United States. Plaintiff seeks, on Circle's behalf, equitable relief against unconstitutional conduct by a federal officer.

31. This Court has authority to grant declaratory relief and further necessary or proper relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and under its inherent equitable powers.

32. This Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a) because those claims are so related to the federal claims that they form part of the same case or controversy under Article III.

33. This Court has personal jurisdiction over President Trump in his official capacity because he resides in and performs his official duties in the District of Columbia.

34. This Court has personal jurisdiction over World Liberty under D.C. Code § 13-423(a)(1), which reaches a person "who acts directly or by an agent" in "transacting any business in the District of Columbia." The claims alleged in this Complaint against World Liberty arise from and relate to business that World Liberty transacted in the District, directly and through its

directors, co-founders, and agents, while the transactions at issue were pending and their proceeds were being paid. As alleged in this Complaint, those contacts include, but are not limited to: the attendance of World Liberty director Martin Edelman, a signatory of the Aryam agreement, and World Liberty co-founder Steve Witkoff at the White House dinner the President hosted for Sheikh Tahnoon on March 18, 2025, while half of Aryam's purchase price remained unpaid; the presence in the District of World Liberty director Peng Xiao, the other Aryam signatory, during Sheikh Tahnoon's March 17–20, 2025 visit; World Liberty's promotion of its business and its stablecoin in the District, including at the White House Crypto Summit and at the DC Blockchain Summit, a Washington conference held the day after USD1 launched; World Liberty's defense of the MGX transaction to United States Senators through counsel in the District; and World Liberty's promotion of USD1 at a June 14, 2026 event at the White House. By engaging in these and the other acts alleged in this Complaint, World Liberty purposefully directed its business toward the District, and the claims relate to that conduct: the receipt of payments from foreign-State sources while World Liberty's directors and co-founders met with the President and his senior officials in the District.

35. This Court has personal jurisdiction over WLF Holdco, which is named as a relief defendant. WLF Holdco holds the only membership interest in World Liberty, receives World Liberty's distributions, and holds proceeds of the emoluments at issue, which the President accepted while residing and holding office in the District. Upon information and belief, WLF Holdco acts through World Liberty's officers, directors, and managers, including members of its board of managers who are also World Liberty co-founders.

36. This Court has personal jurisdiction over Stablecoin Holdco under D.C. Code § 13-423(a)(1). Stablecoin Holdco owns World Liberty's stablecoin business and, upon information and

belief, conducts its business through World Liberty and its officers, directors, and managers, who act as its agents in operating and promoting USD1. The claims against Stablecoin Holdco arise from business conducted and transacted in the District on its behalf, including World Liberty's promotion of USD1 in the District at the DC Blockchain Summit the day after USD1 launched and at the White House in June 2026, and World Liberty's defense of the MGX transaction to United States Senators through counsel in the District. Stablecoin Holdco also issued the Class C units through which the Aryam transaction occurred and through which Aryam acquired its interest in the stablecoin business, all while World Liberty's directors and co-founders met with the President and his senior officials in the District and before Aryam's second installment was due.

37. This Court has personal jurisdiction over DT Marks DEFI and DT Marks SC under D.C. Code § 13-423(a)(1), which reaches a person "who acts directly or by an agent" in "transacting any business in the District of Columbia." Upon information and belief, they have no business of their own apart from holding the President's and his family's interests in World Liberty and its stablecoin business and receiving payments from that business. The President controls them through the Trust, of which he is the sole present beneficiary, and members of his family manage them. DT Marks DEFI and DT Marks SC are the means by which the President, while residing and holding office in the District, has accepted the emoluments at issue, and the claims against them arise from that acceptance. Upon information and belief, both entities act at the President's direction and are his alter egos for the purpose of holding and receiving the proceeds of World Liberty and otherwise as it relates to the allegations in this Complaint. DT Marks DEFI and DT Marks SC also received proceeds of transactions that World Liberty's directors and co-founders advanced in the District while those transactions were pending, as alleged above. Both companies

are named as relief defendants because they hold proceeds of the emoluments at issue, and complete relief cannot be had without them.

38. This Court has personal jurisdiction over Steve Witkoff because he is an officer of the United States sued in his official capacity who resides in this District, where he performs his official duties.

39. Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because a defendant in this action, the President, is an officer of the United States sued in his official capacity who resides in this District, and because a substantial part of the events or omissions giving rise to the claims occurred in this District. Venue is proper as to the Private Company Defendants under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including the President's acceptance of the emoluments described in this Complaint while residing and holding office in the District, and the meetings and promotions described herein. Venue is also proper under 28 U.S.C. § 1401, which provides that "[a]ny civil action by a stockholder on behalf of his corporation may be prosecuted in any judicial district where the corporation might have sued the same defendants," and under 28 U.S.C. § 1391(b). Venue is also proper as to Mr. Witkoff under 28 U.S.C. § 1391(e)(1)(A), because he is an officer of the United States sued in his official capacity who resides in this District, where he performs his official duties.

40. This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

## FACTUAL ALLEGATIONS

### A. President Trump, His Family, and World Liberty

41. World Liberty is a cryptocurrency business co-founded by President Trump, his sons, and others in September 2024. World Liberty has identified President Trump as its "Co-Founder Emeritus" and his three sons, Donald Trump Jr., Eric Trump, and Barron Trump, as "Co-Founders." World Liberty raised $20 million from WLFI token sales in its first month of operation.

42. From the outset, the Trump family took the lion's share of ownership in World Liberty. By March 2025, the Trump family had a claim on 75% of net revenues from token sales and 60% from World Liberty operations once the core business got going.

43. According to disclosures on World Liberty's website, the Trump family's equity interest ultimately fell from 75% to 38% in 2025, although World Liberty never disclosed who bought the difference. This decline is consistent with the Aryam purchase described below. The President's financial disclosure for 2025 shows the result precisely: DT Marks DEFI holds 38.25% of WLF Holdco, which holds World Liberty, and DT Marks SC holds 38.25% of Stablecoin Holdco, which holds World Liberty's stablecoin business. A 75% stake reduced by the sale of 49% of the company is 38.25% (75% × 51% = 38.25%).

44. President Trump personally profits from World Liberty. His financial disclosure for 2024, filed in June 2025, reported more than $57 million in token-sale income of World Liberty Financial, Inc., in which he held an indirect interest, and showed that he held an interest in 15.75 billion World Liberty governance tokens. The President's financial disclosure for 2025 reports that, through DT Marks DEFI and DT Marks SC, the President received: (a) more than $526 million from World Liberty token sales; (b) more than $65 million in "[n]et proceeds from Equity Sale in WLF Holdco LLC"; and (c) more than $196 million in "[n]et proceeds received from

Capital Contribution from new member(s) of Stablecoin Holdco LLC and sale of Class C Units of Stablecoin Holdco LLC." The disclosure also reports more than $8 million in "Net Operating Income" from the "Stablecoin Business" held by Stablecoin Holdco.

45. President Trump has not divested his interests in World Liberty. The President's interests are still held in the Donald J. Trump Revocable Trust—a trust which specifies that the President is its sole present beneficiary.

46. On March 25, 2025, World Liberty announced the launch of a dollar stablecoin, USD1. World Liberty has represented that USD1 is backed by short-term United States government Treasury securities, United States dollar deposits, and other cash equivalents.

**B. The UAE Buys Into the President's Business**

47. Sheikh Tahnoon bin Zayed Al Nahyan is a senior official of the government of the UAE. He is the deputy ruler of Abu Dhabi and serves as the UAE's national security adviser. In 2023, he was placed in charge of the Abu Dhabi Investment Authority, the emirate's sovereign wealth fund. He also chairs G42, an Abu Dhabi artificial-intelligence company, and MGX, the investment company described below. He oversees a more than $1.3 trillion empire funded by his personal fortune and state money.

48. In early December 2024, Steve Witkoff, who had helped launch World Liberty and whom the President-elect had chosen as his special envoy to the Middle East, traveled to the UAE, where he attended a crypto conference with Eric Trump. While there, he also met with Sheikh Tahnoon. About a week later, two entities, each named Aryam Investment 1, were registered two days apart in Delaware and in Abu Dhabi (together, "Aryam"). The Delaware entity is managed by executives of G42. The Abu Dhabi entity shares an office address with several other companies in Sheikh Tahnoon's broader business empire.

49. On January 16, 2025, four days before President Trump's inauguration, Aryam signed an agreement with World Liberty to purchase a 49% stake in World Liberty for $500 million. Half of the $500 million purchase price was paid up front. Of that amount, $187 million went to DT Marks DEFI and DT Marks SC.

50. The remaining $250 million of the purchase price was due by July 15, 2025, nearly six months after President Trump took office.

51. Upon information and belief, entities owned by the President received Aryam money after he took office. The President's financial disclosure reports $262.5 million in 2025 proceeds to DT Marks DEFI and DT Marks SC from the sale of equity in WLF Holdco and Stablecoin Holdco, which is approximately $75.5 million more than the $187 million those entities received from Aryam's first installment. Upon information and belief, that additional amount came from the second installment of Aryam's investment, which was due after the President took office.

52. Aryam received board seats and a hand in the stablecoin business. The agreement made Aryam the largest shareholder of World Liberty and placed Mr. Xiao and Mr. Edelman on World Liberty's five-person board, alongside Eric Trump and Zach Witkoff, Steve Witkoff's son. Fiacc Larkin, G42's head of crypto and blockchain, who also advises the Abu Dhabi Department of Economic Development, a government agency, joined World Liberty in January 2025 as its chief strategic adviser and oversaw the USD1 project.

53. The Aryam transaction was not disclosed to the public when it was made. It became public more than a year later, through reporting by the Wall Street Journal on or about January 31, 2026.

54. Upon information and belief, Aryam, and the funds it used to purchase its stake in World Liberty, are owned or controlled by Sheikh Tahnoon in his capacity as a senior official of

the government of Abu Dhabi and the UAE, or by entities that are instrumentalities of that government. The Delaware Aryam entity is managed by executives of G42, a company Sheikh Tahnoon chairs, and the Abu Dhabi Aryam entity shares an office address with his other companies.

**C. MGX, Binance, and the $2 Billion USD1 Payment**

55. MGX is an Abu Dhabi investment company. MGX is an instrumentality of the government of Abu Dhabi and the UAE.

56. MGX was created in March 2024 by Abu Dhabi's Artificial Intelligence and Advanced Technology Council, which was established in January 2024 by the President of the UAE, with Mubadala and G42 as MGX's "foundational partners." The Council is a body of the government of Abu Dhabi, created by Abu Dhabi law. Mubadala is a sovereign investor that manages its portfolio "for its shareholder, the Government of Abu Dhabi."[6]

57. Sheikh Tahnoon was named Chairman of MGX's Board of Directors at its launch and chaired its inaugural board meeting in May 2024. MGX's Vice Chairman, Khaldoon Al Mubarak, is the Managing Director and Group Chief Executive Officer of Mubadala. MGX's board also includes Peng Xiao and Martin Edelman, the two G42 executives who signed the Aryam agreement and joined World Liberty's board. As one publication put it: "The Abu Dhabi government created MGX in March 2024 as a technology investment company."[7]

---

[6] Mubadala Inv. Co., *About Mubadala*, Mubadala, https://www.mubadala.com/en/who-we-are/about-mubadala (last visited Oct. 21, 2026); *see also* Mubadala Inv. Co., *Our History*, Mubadala, https://www.mubadala.com/en/who-we-are/our-history (last visited Oct. 21, 2026).

[7] Zach Everson, *Abu Dhabi Fund MGX Emerges as Key Player in Two Major Trump-Era Deals*, Forbes (Oct. 15, 2025), https://www.forbes.com/sites/zacheverson/2025/10/15/mgx-abu-dhabi-tiktok-trump-usd1-binance-aligned-data-centers/.

58. On March 12, 2025, MGX and Binance announced "a landmark $2 billion investment" by MGX in Binance, securing a minority stake in the exchange.[8] MGX described it as "the single largest investment into a crypto company and the largest investment ever paid in crypto (stablecoin)."[9] The announcement did not say which stablecoin would be used.

59. USD1 did not yet exist at the time of this announced investment. World Liberty did not unveil USD1 until March 25, 2025, thirteen days after the MGX investment was announced.

60. On May 1, 2025, World Liberty co-founder Zach Witkoff, the son of Special Envoy Steve Witkoff, appeared on a panel with Eric Trump and announced: "We are excited to announce today that USD1 has been selected as the official stablecoin to close MGX's $2 billion investment in Binance."[10]

61. The USD1 tokens ultimately used for the MGX transaction were created in the days just before that announcement. As of April 22, 2025, roughly 127 million USD1 tokens were in circulation. Eight days later, as of April 30, 2025, 2.127 billion tokens were in circulation, an increase of approximately two billion tokens. Upon information and belief, substantially all of that growth was attributable to the issuance of USD1 for the MGX transaction.

62. Binance shaped that choice. Before the deal was sealed, Binance asked MGX to pay the $2 billion purchase price in the soon-to-be-released World Liberty stablecoin, and the Emiratis agreed. In late April 2025, Binance founder, Changpeng Zhao, met with Zach Witkoff at a private Binance summit in Abu Dhabi for top clients. The summit was also attended by a UAE

---

[8] Press Release, MGX, *MGX Backs Binance in Landmark Investment* (Mar. 12, 2025), https://www.mgx.ae/news-insights/mgx-backs-binance-landmark-investment.

[9] *Id.*

[10] Federico Maccioni, *Trump's Stablecoin Chosen for $2 Billion Abu Dhabi Investment in Binance, Co-founder Says*, Reuters (May 1, 2025), https://www.reuters.com/world/middle-east/wlfs-zach-witkoff-usd1-selected-official-stablecoin-mgx-investment-binance-2025-05-01/.

executive who oversaw the MGX investment—and is also a World Liberty adviser—and by a lobbyist representing both Binance and World Liberty. The following evening, World Liberty began issuing the USD1 for the deal. To complete the transaction, MGX bought USD1 from World Liberty, handing the Trump family venture $2 billion in cash. MGX finalized its stake in Binance two days later, then transferred the $2 billion in USD1 to Binance, which has held most of those tokens on its own platform. Binance and World Liberty deny that Binance arranged the use of USD1; Binance's lawyer has said that Binance "did not control the stablecoin chosen by MGX."[11]

63. MGX later told Forbes that Binance requested that the deal be settled in cryptocurrency, and that MGX chose USD1 because, among other things, it was backed 1:1 by a conservative mix of U.S. dollar-denominated assets. MGX cited USD1's compliance history. But at the time MGX announced its investment, USD1 had not been launched and had no track record at all. People close to the transaction at the time expressed confusion about MGX's choice of USD1 and sought to understand why the stablecoin had been selected.

64. World Liberty itself told United States Senators that, absent USD1, "[t]he transaction in question would have otherwise been settled in a foreign currency, most likely UAE dirhams."[12] The Senators then asked MGX and Binance whether they had considered "alternative

---

[11] Angus Berwick, Patricia Kowsmann & Rebecca Ballhaus, *How a Billionaire Felon Boosted Trump's Crypto Company en Route to a Pardon*, Wall St. J. (Oct. 29, 2025), https://www.wsj.com/finance/currencies/binance-trump-crypto-pardon-cz-changpeng-zhao-1007fde9.

[12] Letter from Teresa Goody Guillén & Jonathan R. Barr, Partners, Baker & Hostetler LLP, to Sen. Elizabeth Warren, Ranking Member, S. Comm. on Banking, Hous., & Urb. Affs., & Sen. Jeff Merkley 2 (May 29, 2025), https://www.banking.senate.gov/imo/media/doc/wlfi_response_to_senators_merkley_and_warren_signed.pdf [hereinafter WLF Response Letter]; *see also* Letter from Sen. Elizabeth Warren, Ranking Member, S. Comm. on Banking, Hous., & Urb. Affs., & Sen. Jeffrey A. Merkley to Ahmed Yahia Al Idrissi, Managing Dir. & Chief Exec. Officer, MGX, & Richard Teng, Chief Exec. Officer, Binance 2 (June 10, 2025), https://www.banking.senate.gov/imo/media/doc/warren_merkley_letter_to_mgx_binance_re__wlf_response.pdf [hereinafter Warren & Merkley Letter].

stablecoins" and, if so, "[w]hy were those alternatives not ultimately selected?"[13] Neither company has publicly answered the Senators' letter, and neither has said whether it considered USDC. MGX has said only that it evaluated stablecoins on several platforms before selecting USD1. World Liberty's response to the Senators was signed by Teresa Goody Guillén of BakerHostetler. Binance paid that firm to lobby on crypto policy and "executive relief," and Ms. Goody Guillén attended the April 2025 Binance summit.

65. In fact, USDC—Circle's own stablecoin—was available to close MGX's $2 billion investment in Binance. Binance had announced months earlier that it would adopt USDC for its own corporate treasury. On March 10, 2025, two days before the MGX investment was announced, Binance announced new USDC trading pairs.[14] And as of March 26, 2025, more than $60 billion of USDC was in circulation.

66. The MGX transaction transformed the use of and, therefore, the value of the President's USD1 coin. By October 2025, Binance held about $2 billion worth of USD1, approximately 75% of the stablecoin's market capitalization. As of mid-October 2025, USD1 was the sixth-largest stablecoin, with a market capitalization of about $2.7 billion. By February 2026, Binance held roughly $4.7 billion of the $5.4 billion of USD1 then in circulation, or about 87%. As of August 31, 2026, more than 4.1 billion USD1 tokens were in circulation.

67. Every day that the USD1 issued for the MGX transaction remains outstanding, the reserves backing it generate income via World Liberty for the President and his family. The MGX deal gave World Liberty a $2 billion cash pile, which the company holds in reserve. The company invests the money in Treasurys and pockets the interest, generating about $80 million if held for a

---

[13] Warren & Merkley Letter, *supra* note 12, at 4.

[14] Binance, *Notice on New Trading Pairs & Trading Bots Services on Binance Spot*, Binance Square (Mar. 10, 2025), https://www.binance.com/en/square/post/21353479804185.

year. Although BitGo formally mints USD1 and holds its reserves, the economics of those reserves flow to World Liberty's stablecoin business. The MGX transaction also benefited World Liberty's token business. The use of USD1 boosted World Liberty, expanding its market cap and giving it new clout, which in turn helped with sales of its other cryptocurrency, WLFI. World Liberty's business partners have cited its stablecoin's success as a reason to invest in WLFI.

68. Assuming a 3.5% yield on $4.7 billion in reserves, akin to the yield Circle discloses, World Liberty would keep about $147 million in income from its holdings in 2026, net of the custodian's fee and a small allocation for marketing. The vast majority of USD1 sits on Binance.

69. The income generated by the reserves backing the MGX USD1 flows to World Liberty's stablecoin business and, through the Trump family's interests in it, to President Trump. The President's financial disclosure for 2025 reports $8.326 million in "Net Operating Income" from the "Stablecoin Business" held by Stablecoin Holdco, in which DT Marks SC holds 38.25%; the President, through the Trust, holds 70% of DT Marks SC. Upon information and belief, the stablecoin business is also co-owned, through Aryam, by Sheikh Tahnoon, so that the reserve income from MGX's USD1 enriches the President and the Emirati official together.

70. Binance's relationship with USD1 extends well beyond holding MGX's tokens. Ahead of USD1's March 2025 launch, Binance "deployed a team of over a dozen engineers to build the technology behind the currency," including its Hong Kong–based stablecoin chief. That followed an internal Binance task force that had studied how to move money into the Trump family company. World Liberty has acknowledged that Binance provided USD1's smart contracts, which it said was done "to save WLFI the headache of reproducing them, but not in exchange for anything." Binance listed USD1 for trading on May 22, 2025. In June 2025, World Liberty announced a partnership to "drive USD1 adoption" with PancakeSwap, a trading platform

"administered by Binance." That sent USD1's trading volumes soaring. Binance wrote the basic code to power USD1. In October 2024, World Liberty had hired one of Zhao's close friends, Rich Teo, who had run a Binance stablecoin product.

71. In December 2025, World Liberty announced that Binance would convert all collateral assets backing Binance-Peg BUSD (B-Token) into USD1 at a 1:1 ratio, add new USD1 trading pairs, and offer zero fees on certain USD1 pairs, including USD1/USDC. As Zach Witkoff put it, "[b]y integrating USD1 into liquidity, trading, and collateral systems on the world's largest exchange, Binance is giving hundreds of millions of users improved access to USD1."[15] USD1 continued to grow from there. World Liberty announced in December 2025 that USD1 had surpassed $3 billion in circulating supply, and in January 2026 USD1 surpassed $5 billion in market capitalization, becoming the fifth-largest stablecoin less than a year after its launch.

**D. Official Acts Benefiting Those Who Enriched the President**

72. The UAE's payments to the President's crypto business were accompanied and followed by official actions of the President and his administration that benefited the UAE, Sheikh Tahnoon, and Binance.

73. First, after the UAE's crypto payments, Sheikh Tahnoon gained special access to the President and senior officials in the U.S. government. Sheikh Tahnoon met repeatedly with the President and senior officials, including on March 18, 2025, when the President hosted a White House dinner for Sheikh Tahnoon and his delegation. That dinner was attended by the Vice President and the Secretaries of State, Commerce, and the Treasury. On the President's first full day in office, five days after Aryam signed its deal with World Liberty, the President announced

[15] Press Release, World Liberty Fin., *Binance Adds Major USD1 Trading Pairs, Will Convert BUSD Collateral to World Liberty Financial's Stablecoin in Largest Exchange Integration Yet*, Bus. Wire (Dec. 11, 2025), https://www.businesswire.com/news/home/20251211778880/en/.

a $500 billion artificial-intelligence venture at the White House; MGX was one of two additional investors named.

74. Second, following the UAE's crypto payments, the President provided the UAE with advanced-chip approvals—something prior U.S. government administrations had considered too dangerous, given the UAE's relationship with China. The prior administration had worried that such technology could end up in China, and some officials in the current administration shared that worry. On or about May 14, 2025, during the President's visit to the Gulf, Reuters reported, citing people familiar with the matter, that the United States was close to a preliminary agreement to allow the UAE to import 500,000 of Nvidia's most advanced artificial-intelligence chips per year, starting in 2025, with 20% of the chips, or 100,000 per year, to go to G42. The chip agreement came only two weeks after Zach Witkoff announced that MGX would use USD1 for the Binance transaction. On May 15, 2025, the Commerce Department announced that a new artificial-intelligence campus in Abu Dhabi would be built by G42 and operate in partnership with several U.S. companies. On November 19, 2025, the Department of Commerce announced that it had authorized G42 to acquire up to 35,000 advanced artificial-intelligence chips.

75. Third, following the UAE's crypto payments, the UAE received favorable treatment by the President and his administration. On May 8, 2025, the Treasury Department announced a fast-track pilot program for foreign investors—precisely the speedier review process the UAE had sought. And in September 2025, under a deal negotiated by the President's administration, MGX became one of a handful of investors selected to operate TikTok in the United States.

76. Fourth, following the UAE's crypto payments, the President pardoned Changpeng Zhao. In November 2023, Binance pleaded guilty and agreed to pay more than $4 billion to resolve

a Justice Department investigation into violations of the Bank Secrecy Act, failure to register as a money-transmitting business, and violations of the International Emergency Economic Powers Act. Binance's founder and then-chief executive, Changpeng Zhao, pleaded guilty to failing to maintain an effective anti-money-laundering program. He was sentenced to four months in prison. Mr. Zhao lives in Abu Dhabi, holds Emirati citizenship, and is close to Sheikh Tahnoon. Sheikh Tahnoon's $2 billion investment in Binance through MGX gave him a financial stake in helping its founder Changpeng Zhao obtain a pardon from President Trump.

77. In March 2025, the Trump family had held talks about taking a stake in Binance's U.S. affiliate. In mid-to-late April 2025, shortly before World Liberty announced that USD1 would be used for MGX's investment in Binance, Mr. Zhao formally applied for a pardon. On October 21, 2025, President Trump pardoned Mr. Zhao. Binance lobbied for that result. In 2025, after hiring no lobbyists the year before, Binance hired four U.S. lobbying firms. Of the roughly $800,000 it spent in the first nine months of the year, $450,000 went to a firm run by a lobbyist close to the Trump family, whom Binance hired to push for a pardon, and $260,000 went to BakerHostetler to lobby on crypto policy and "executive relief." The President said he granted the pardon "at the request of a lot of very good people." The pardon was expected to pave the way for Binance to return to the United States, formerly one of its largest markets. The Wall Street Journal described it as "the most distinct instance yet of Trump using the powers of his office to benefit someone at the center of deals that have enriched his family."[16]

78. Fifth, following the UAE crypto payments, the administration approved a bank charter for World Liberty Trust Company. On January 7, 2026, WLTC Holdings LLC, an entity created by World Liberty, applied to the Office of the Comptroller of the Currency ("OCC") to

---

[16] Berwick et al., *supra* note 11.

establish World Liberty Trust Company, National Association, a national trust bank for stablecoin operations. Senator Elizabeth Warren asked the Comptroller of the Currency to delay review of the application until the President divested from World Liberty, warning that "[i]f the application is approved, you would promulgate rules that influence the profitability of the President's company."[17] On August 14, 2026, the OCC granted preliminary conditional approval, which would allow World Liberty's own trust bank to issue USD1 and manage the reserves backing it. Sheikh Tahnoon and co-investors hold a 49% stake in the holding company World Liberty created to pursue that bank charter, through an entity called StringZ Holding RSC.

79. Upon information and belief, the UAE crypto payments helped to secure favorable treatment, in the ways described above, from President Trump and his administration.

80. The President and his administration have denied that his business interests influenced these decisions. World Liberty has said that the President has not been involved in the company since taking office. The White House Counsel has said that "[t]he President has no involvement in business deals that would implicate his constitutional responsibilities," and a White House spokeswoman has said that "[t]here are no conflicts of interest."[18]

## E. World Liberty's Business in Washington

81. While the Aryam and MGX transactions were pending, World Liberty's directors, co-founders, and executives conducted World Liberty's business in the District, often at the White House itself.

---

[17] Letter from Sen. Elizabeth Warren, Ranking Member, S. Comm. on Banking, Hous., & Urb. Affs., to Jonathan Gould, Comptroller of the Currency, Off. of the Comptroller of the Currency 2 (Jan. 13, 2026), https://www.banking.senate.gov/imo/media/doc/0113lettertooccrewlfapplication.pdf.

[18] Kessler et al., *supra* note 2.

82. On March 7, 2025, World Liberty co-founder Zach Witkoff attended the White House Crypto Summit, held in the State Dining Room of the White House.

83. World Liberty's own website held out the sitting President as a current member of World Liberty's "team," serving as its "Chief Crypto Advocate."

84. On March 17, 2025, Sheikh Tahnoon arrived in Washington for a four-day visit. He was accompanied by Peng Xiao, the G42 chief executive, who had signed the Aryam agreement and joined World Liberty's board. During the visit, Sheikh Tahnoon met with the President in the Oval Office and pledged that the UAE would invest $1.4 trillion in the United States over a decade. On the same trip, he pressed for a chip deal and faster government review of UAE investments.

85. The next day, March 18, 2025, the President hosted a dinner at the White House for Sheikh Tahnoon and his delegation, to which he invited the Vice President and the Secretaries of State, Commerce, and the Treasury. Sheikh Tahnoon sat beside World Liberty co-founder Steve Witkoff. Martin Edelman, the G42 general counsel who had signed the Aryam agreement and joined World Liberty's board, sat at the end of the table. At the time, the second $250 million installment of Aryam's purchase price was not yet due, and MGX had not yet settled its $2 billion investment in Binance.

86. Steve Witkoff co-founded World Liberty with his son, Zach Witkoff, and members of the Trump family. Zach Witkoff is World Liberty's chief executive officer. Steve Witkoff retained a financial interest in World Liberty through at least August 2025 while serving as the President's special envoy. As late as September 2025, the White House said Steve Witkoff was "still in the process of divesting." He later reported nearly $107 million in 2025 income from a World Liberty-affiliated holding company. Upon information and belief, Steve Witkoff advocated within the administration on behalf of the UAE as the administration considered whether to permit

the export of advanced artificial intelligence chips to the UAE and G42. Upon information and belief, he did not recuse himself from the administration's deliberations concerning the UAE.

87. On March 26, 2025, the day after World Liberty announced USD1, World Liberty's co-founders, including Zach Witkoff, Zak Folkman, and Chase Herro, appeared at the DC Blockchain Summit in Washington and spoke about stablecoins.

88. On May 29, 2025, World Liberty, through counsel in the District, wrote to two United States Senators to defend the MGX transaction, asserting that "the MGX-Binance transaction you reference underscores a key benefit of USD1 as a payment instrument." The letter was written by Teresa Goody Guillén of BakerHostetler on behalf of "World Liberty Financial, Inc." Throughout 2025, the same attorney was registered to lobby the Executive Office of the President on Binance's behalf regarding "executive relief."

89. Binance's other lobbyist, Ches McDowell of Checkmate Government Relations, reported lobbying the White House Office and the Treasury Department on "executive relief." Binance paid his firm $450,000 in the third quarter of 2025 alone, the quarter before the President pardoned Binance's founder.

90. On June 14, 2026, World Liberty contributed $250,000 in USD1 to the fighters' bonus pool for a UFC event held on the South Lawn of the White House.[19]

**F. The Foreign Emoluments Clause**

91. The United States Constitution is replete with innovations in how governments function and in how people relate to their government. The people who wrote the Constitution

[19] Zack Abrams, *Trump-Backed World Liberty Financial to Fund UFC Fighter Bonuses in USD1 Stablecoin at White House Event*, The Block (June 14, 2026), https://www.theblock.co/post/404697/; Zac Pacleb, *Bonus Coverage | UFC Freedom 250*, UFC (June 15, 2026), https://www.ufc.com/news/bonus-coverage-ufc-freedom-250.

changed the course of history, and the founders did so by rejecting a particular kind of government. The Declaration of Independence did not object to the King of Great Britain in the abstract. It objected to the way his power worked in practice: through a court of favored officers whose fortunes depended on royal favor rather than on the people they governed. "He has erected a multitude of New Offices," the Declaration charged, "and sent hither swarms of Officers to harass our people, and eat out their substance."[20] And "[h]e has made Judges dependent on his Will alone, for the tenure of their offices, and the amount and payment of their salaries."[21]

92. The founding generation understood that a republic was vulnerable to a different version of the same disease. A king can be bought only at great price, because the kingdom is already his. A republican officer can be bought for less. As Alexander Hamilton explained, "[o]ne of the weak sides of republics, among their numerous advantages, is that they afford too easy an inlet to foreign corruption."[22]

93. The Constitution's unambiguous ban on emoluments comes from this same time and serves this same foundational purpose: ensuring that Americans are not ruled by kings, or by a corrupt and petty court of the kind the Revolution was fought to escape. The Articles of Confederation already provided that no "person holding any office of profit or trust under the United States, or any of them, [shall] accept any present, emolument, office or title of any kind whatever from any King, Prince or foreign State."[23] At the Constitutional Convention, Charles Pinckney "urged the necessity of preserving foreign Ministers & other officers of the U. S.

---

[20] The Declaration of Independence para. 12 (U.S. 1776).
[21] The Declaration of Independence para. 11 (U.S. 1776), https://www.archives.gov/founding-docs/declaration-transcript.
[22] *The Federalist No. 22* (Alexander Hamilton), https://avalon.law.yale.edu/18th_century/fed22.asp (last visited Oct. 21, 2026).
[23] Articles of Confederation of 1781, art. VI, para. 1.

independent of external influence" and moved to carry the prohibition into the new Constitution. The motion passed without a dissenting vote.[24]

94. The result is the Foreign Emoluments Clause, which provides: "No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State."[25]

95. The President holds an "Office of Profit or Trust under" the United States and is bound by the Foreign Emoluments Clause.

96. The Foreign Emoluments Clause has one exception: the consent of Congress.

97. The founders knew precisely what they were guarding against, because they had seen it. European courts customarily lavished gifts on foreign envoys. When the United States signed its treaty with France, the King presented the American commissioners with gold snuff boxes bearing his portrait "set in brilliants in the lid." Arthur Lee, on his return, asked Congress whether he should keep the gift.[26] As Edmund Randolph told the Virginia ratifying convention, "[i]t was thought proper, in order to exclude corruption and foreign influence, to prohibit any one in office from receiving or holding any emoluments from foreign states."[27]

---

[24] James Madison, *Notes of Debates in the Federal Convention of 1787* (Aug. 23, 1787), https://avalon.law.yale.edu/18th_century/debates_823.asp (last visited Oct. 21, 2026); *see* 2 *The Records of the Federal Convention of 1787,* at 389 (Max Farrand ed., 1911).

[25] U.S. Const. art. I, § 9, cl. 8.

[26] Thomas Jefferson, *Notes of Presents Given to American Diplomats by Foreign Governments* (ca. 1791), https://founders.archives.gov/documents/Jefferson/01-16-02-0206-0004 (last visited Oct. 21, 2026).

[27] 3 *The Records of the Federal Convention of 1787*, at 327 (Max Farrand ed., 1911); 3 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 465 (Jonathan Elliot ed., 2d ed. 1836); *see Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize*, 33 Op. O.L.C. 370 (2009).

98. The Executive Branch has long read the Foreign Emoluments Clause broadly. The Department of Justice's Office of Legal Counsel has explained that the Clause "was intended to protect foreign ministers and other officers of the United States from undue influence and corruption by foreign governments," and that "[t]he language of the Emoluments Clause is both sweeping and unqualified."[28]

99. An emolument is unconstitutional regardless of whether the officer who accepts it is actually influenced by it. The Clause is prophylactic. It prohibits the acceptance of the benefit because the influence such payments from foreign governments may buy is simultaneously so difficult to detect and so dangerous to the Republic.

**G. Congress Has Not Consented**

100. Congress has not consented to President Trump's acceptance of any of the emoluments described in this Complaint.

101. President Trump has not sought the consent of Congress to accept any of these emoluments.

102. To the contrary, Members of Congress have repeatedly objected. In May 2025, Senator Richard Blumenthal introduced a resolution that would authorize the Senate to take legal action to enforce Trump's compliance with the Foreign Emoluments Clause; the resolution was blocked. Senators wrote to World Liberty, to MGX, and to Binance seeking records of the $2 billion USD1 transaction, noting that "the President stands to benefit from your companies' use of USD1 in this transaction."[29] Senators asked the Secretary of the Treasury to determine whether the

[28] *Applicability of the Emoluments Clause to Non-Government Members of ACUS*, 17 Op. O.L.C. 114, 116, 120 (1993).

[29] Warren & Merkley Letter, *supra* note 12, at 1; *see also* Letter from Sen. Elizabeth Warren, Ranking Member, S. Comm. on Banking, Hous., & Urb. Affs., & Sen. Jeffrey A. Merkley to Zach Witkoff, Co-Founder, World Liberty Fin., Inc. 1 (May 14, 2025), https://www.banking.senate.gov/

Aryam transaction required review by the Committee on Foreign Investment in the United States, and asked the chairs of four Senate committees and a subcommittee to hold hearings on it.[30]

### H. Circle and USDC

103. Circle was co-founded in 2013 by Jeremy Allaire and P. Sean Neville. Mr. Allaire has served as its Chairman and Chief Executive Officer since its founding.

104. Circle began issuing USDC**,** a United States dollar stablecoin that is backed one-for-one by reserves, in September 2018. As of December 31, 2025, Circle held approximately 88% of USDC reserves in the Circle Reserve Fund, a registered government money market fund managed by BlackRock and available only to Circle.

105. Circle's stock began trading on the New York Stock Exchange on June 5, 2025.

106. At the time of its initial public offering, Circle reported $60.1 billion of USDC in circulation as of March 31, 2025. USDC in circulation grew to approximately $75.3 billion by December 31, 2025, and stood at $73.3 billion as of June 30, 2026.

107. Circle's business depends almost entirely on reserve income. In 2025, Circle reported reserve income of approximately $2.64 billion out of total revenue and reserve income of approximately $2.75 billion, or approximately 96%. In the second quarter of 2026, Circle reported

imo/media/doc/20250514_final_warren_merkley_letter_to_wlf_re__stablecoin_communications pdf.pdf; Press Release, S. Comm. on Banking, Hous., & Urb. Affs., *Warren, Merkley Seek Records on $2 Billion Trump Stablecoin Deal from UAE Firm and Binance* (June 11, 2025), https://www.banking.senate.gov/newsroom/minority/warren-merkley-seek-records-on-2-billion-trump-stablecoin-deal-from-uae-firm-and-binance.

[30] Letter from Sen. Elizabeth Warren, Ranking Member, S. Comm. on Banking, Hous., & Urb. Affs., & Sen. Andy Kim, Ranking Member, S. Subcomm. on Nat'l Sec. & Int'l Trade & Fin., to Scott Bessent, Sec'y of the Treasury & Chair, Comm. on Foreign Inv. in the U.S., Dep't of the Treasury 1 (Feb. 13, 2026), https://www.banking.senate.gov/imo/media/doc/letter_to_bessent_re_cfius_wlf.pdf; Letter from Sen. Elizabeth Warren, Ranking Member, S. Comm. on Banking, Hous., & Urb. Affs., et al., to Sen. Mike Crapo, Chairman, S. Comm. on Fin., et al. 1 (June 23, 2026), https://www.banking.senate.gov/imo/media/doc/uae_wlfi_hearing_request.pdf.

reserve income of approximately $668 million out of total revenue and reserve income of approximately $701 million.

108. Circle shares a substantial part of its reserve income with distribution partners, including cryptocurrency exchanges, in exchange for their promotion and use of USDC. In 2025, Circle recorded approximately $1.66 billion in distribution and transaction costs.

109. Circle operates in a competitive market. Its annual report warns investors: "We face intense and increasing competition."

110. Binance is the world's largest cryptocurrency exchange. In December 2024, Circle and Binance announced a strategic partnership under which "Binance will adopt USDC as a vital dollar stablecoin for their own corporate treasury." In connection with an agreement entered into in November 2024, Circle paid Binance a $60.3 million one-time upfront fee, plus monthly fees.

111. On June 30, 2025, Circle applied to the OCC for a charter to establish a national trust bank, First National Digital Currency Bank, N.A. The OCC granted conditional approval on December 12, 2025, and final approval on July 10, 2026.

## I. How Stablecoin Businesses Make Money

112. A stablecoin is a digital token, recorded on a blockchain, that is designed to maintain a stable value relative to a reference asset, most commonly the United States dollar. A dollar stablecoin is designed to be redeemable for one dollar and is typically backed by a pool of reserve assets, usually cash and short-term United States Treasury securities.

113. When a customer acquires newly issued stablecoins, the customer delivers dollars, and those dollars are added to the reserves. The customer receives a token; the business behind the stablecoin receives, and holds or controls, the money. The holder generally receives no interest.

Instead, the reserves are invested, and the income they generate is kept. Stablecoin reserves typically earn yields around 4%—interest that most times is pocketed entirely by the issuer.

114. Some stablecoin brands, including USD1, use a third-party custodian to mint the tokens and hold the reserves. Under those "stablecoin-as-a-service" arrangements, the business that owns the brand still captures the economics of the reserves, net of the custodian's fees.

115. A stablecoin business's revenue therefore depends principally on two things: the amount of its stablecoin in circulation, and prevailing short-term interest rates. The more tokens outstanding, the larger the reserve, and the larger the income. A large, stable block of tokens that remains outstanding for a long period is especially valuable, because it generates income month after month without redemption.

116. Stablecoins compete with one another for circulation. Holders, including exchanges, institutional investors, and corporate treasuries, choose which stablecoin to hold, transact in, and accept. Cryptocurrency exchanges are an especially important channel, because exchanges hold large stablecoin balances, list trading pairs denominated in particular stablecoins, and accept particular stablecoins as collateral.

## J. Circle's Injury

117. The President's acceptance of emoluments through USD1 has injured Circle as a direct competitor of USD1.

118. Circle's reserve income, and thus its revenue, rises and falls with the amount of USDC in circulation. A dollar of stablecoin demand that goes to a competing stablecoin rather than to USDC is a dollar of reserves on which Circle earns nothing.

119. Circle and World Liberty compete in the same market: fully reserved United States dollar stablecoins for exchanges, institutions, and other holders. Both earn their revenue the same

way, from interest on reserves. A single large holder can move billions of dollars in circulation, as the MGX transaction demonstrates.

120. USD1 offers a feature that USDC does not and cannot offer: the opportunity, by enriching the President, to obtain favorable treatment from the President and his administration. A foreign government, or an entity seeking favor with the President, that chooses to hold or transact in USD1 rather than USDC sends the reserve income on its holdings to the President's family business rather than to Circle.

121. That is what happened here. MGX, an instrumentality of a foreign State, chose to settle a $2 billion transaction in a stablecoin that had existed for weeks, with little compliance history, owned in substantial part by the President's family and, through Aryam, by MGX's own chairman—at the same time that foreign State was seeking valuable decisions from the President's administration. Binance's founder had applied for a presidential pardon shortly before the transaction was announced. It was Binance, which had announced in December 2024 that it would adopt Circle's USDC for its corporate treasury, that asked MGX to pay in USD1 instead.

122. Circle had a specific, existing business relationship with Binance. In November 2024, Circle and Binance entered into an agreement under which Circle paid Binance a $60.3 million one-time upfront fee, plus monthly fees. In December 2024, the two companies announced a strategic partnership under which "Binance will adopt USDC as a vital dollar stablecoin for their own corporate treasury." On March 10, 2025, two days before MGX announced its investment, Binance announced new USDC trading pairs.

123. When MGX agreed to invest $2 billion in Binance, the investment was to be paid in a stablecoin. MGX described it as "the largest investment ever paid in crypto (stablecoin)."

MGX has said it evaluated stablecoins on several platforms. Upon information and belief, USDC was among them until MGX selected USD1 for the reasons alleged in this Complaint.

124. Before the deal was sealed, Binance asked MGX to pay the $2 billion in the World Liberty stablecoin, and the Emiratis agreed. Binance and World Liberty had worked closely together before then. Binance deployed a team of over a dozen engineers to build the technology behind USD1. World Liberty had hired one of Zhao's close friends, who had run a Binance stablecoin product. World Liberty knew of Binance's publicly announced relationship with Circle and its adoption of USDC when it worked with Binance and MGX to have the MGX investment paid in USD1.

125. After the MGX transaction, World Liberty and Binance continued to steer stablecoin business from USDC to USD1. In December 2025, World Liberty announced that Binance would convert the collateral backing Binance-Peg BUSD into USD1, and would offer zero-fee trading on USD1/USDC pairs, thereby encouraging holders of USDC to exchange it for USD1.

126. Circle's losses can be measured. Circle earns reserve income on every dollar of USDC in circulation. In 2025, its reserve return rate was 4.1%; in the second quarter of 2026, it was 3.5%. At those rates, $2 billion in reserves generates approximately $70 million to $82 million in reserve income per year. Upon information and belief, had the MGX investment been paid in USDC, Circle would have earned income on that $2 billion for as long as it remained outstanding.

127. Upon information and belief, but for the opportunity to confer a benefit on the President, some or all of the stablecoin demand created by the MGX transaction and by Binance's subsequent promotion of USD1 would have gone to USDC, and Circle would have earned reserve income on it.

128. In addition, the President's emoluments have distorted competition in the stablecoin market more broadly. World Liberty's association with the President, reinforced by the foreign-State transactions described above, has given USD1 a source of demand, distribution, and regulatory advantage that is unavailable to competitors, including Circle, that do not and will not enrich the President.

129. Circle's injury is ongoing. Each day the USD1 issued for the MGX transaction remains outstanding, it continues to generate reserve income for World Liberty and the President rather than for Circle, and each day the President continues to accept emoluments, USD1 retains a competitive advantage that Circle cannot match.

130. Circle's injury is fairly traceable to the President's acceptance of emoluments. The emoluments are the reason USD1 holds the advantage that harms Circle. Circle's injury is also fairly traceable to Steve Witkoff's conduct. As the President's Special Envoy to the Middle East, Mr. Witkoff conducts the President's dealings with the government of the UAE and its officials, including Sheikh Tahnoon, while he and his family hold interests in World Liberty. The benefits from a foreign State that have flowed to World Liberty—and through it to the President—have come from that government and its instrumentalities. Each further benefit a foreign state confers on World Liberty or USD1 adds to USD1's circulation, reserves, and market position at Circle's expense.

131. Circle's injury is redressable by this Court. A declaration that the President's acceptance of these emoluments is unconstitutional, an injunction prohibiting their continued acceptance without the consent of Congress, and an order requiring disgorgement of the emoluments received would remove the unlawful advantage that USD1 enjoys and restore the conditions of fair competition. An injunction barring Mr. Witkoff from soliciting such benefits for

the President would close one channel through which benefits from a foreign State have reached the President, and would reduce the likelihood that further foreign-state demand is steered to USD1 rather than USDC.

132. Circle is within the zone of interests protected by the Emoluments Clause. A competitor that is harmed when a federal officer accepts benefits that the Constitution forbids may sue to enforce that limitation.

**K. Irreparable Harm, the Equities, and the Public Interest**

133. Circle has no adequate remedy at law against the President for his acceptance of unconstitutional emoluments. Damages are not available against the President in his official capacity, and the competitive harm caused by the President's continued acceptance of emoluments, including lost market share, lost distribution relationships, and lost reserve income on stablecoin demand that will not return, cannot be fully measured or remedied after the fact.

134. The President would suffer no cognizable hardship from an order requiring him to comply with the Constitution. He has no legitimate interest in accepting emoluments that the Constitution forbids without the consent of Congress, and he remains free at any time to seek that consent.

135. The public interest strongly favors relief. The Emoluments Clause protects every American's interest in a President whose decisions are made for the country and not for himself. The public interest is served by enforcing it.

**L. Plaintiff's Standing to Sue Derivatively**

136. Plaintiff brings this action derivatively in the right and for the benefit of Circle to redress injuries suffered, and to be suffered, by Circle as a result of Defendants' conduct. The

claims asserted belong to Circle. Any recovery will be for Circle's benefit. Circle is named as a nominal defendant solely in a derivative capacity.

137. Plaintiff was a stockholder of Circle at the time of each transaction complained of in this Complaint, including the Aryam transaction in January 2025, the MGX USD1 transaction announced on May 1, 2025, and the continuing receipt of emoluments thereafter, and he has held Circle stock continuously since that time. Plaintiff has held Circle Internet Group, Inc. stock since July 1, 2024, when his shares in Circle's Irish predecessor, which he had held since 2018, were exchanged for an equivalent number of shares of Circle.

138. Plaintiff will continue to hold Circle stock throughout this litigation.

139. Plaintiff will fairly and adequately represent the interests of Circle and its stockholders in enforcing and prosecuting Circle's rights.

140. Plaintiff does not bring this action to gain any personal advantage.

141. This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

142. President Trump's unlawful cryptocurrency dealings have materially benefited himself while disadvantaging Circle, but Circle's Board lacks the independence necessary to assert Circle's rights. Plaintiff did not make a demand on the Board to bring this action on behalf of Circle because such a demand would have been a futile, wasteful, and useless act. The Board is not independent from President Trump, and there is substantial reason to doubt that the Board would be able to exercise objective, impartial business judgment regarding a demand to bring this litigation.

### M. Circle's Board Cannot Impartially Consider a Demand to Sue the President

143. At the time this action was filed, Circle's Board consisted of seven directors: Jeremy Allaire, Craig Broderick, M. Michele Burns, Bradley Horowitz, Kirk Koenigsbauer, Danita Ostling, and Adam Selipsky.

144. A demand here would ask Circle's directors to do something extraordinary: authorize a federally regulated company to sue the sitting President of the United States over money flowing into his family's business. Few decisions a board could face are more fraught than this one.

145. Every member of the Board would confront that decision under the same pressures. First, Circle's business depends on the President's government. Its stablecoin is regulated under a statute the President signed and his appointees will administer once it takes effect on January 18, 2027. Its national trust bank operates under a charter granted by a Comptroller the President can remove, and the next phase of that charter, management of the USDC reserve, awaits further regulatory action. A lawsuit against the President would be a lawsuit against the head of the government that licenses and supervises Circle's entire business.

146. Second, Circle is tied to Binance, the exchange through which the UAE's $2 billion transaction ran, which held roughly 87% of all USD1 as of February 2026, and whose founder the President pardoned. In September 2026, Circle sold Binance approximately $100 million of its stock at a discount to market, with the right to vote those shares, and committed to pay Binance monthly fees under a five-year commercial arrangement. Suing over emoluments paid through Binance would set Circle against its own stockholder and one of its most important distribution partners.

147. Third, Circle and its leadership have chosen accommodation over confrontation. Five of the seven current directors sat on the Board when Circle gave $1 million to the President's inaugural committee. Circle's Chairman and Chief Executive Officer sought a seat on the President's crypto advisory council, was singled out for praise at the GENIUS Act signing, has dined at the White House, and has publicly praised the administration. Circle's Chief Legal Officer, now also its President, was reported to be advising the President-elect's transition team. Upon information and belief, the Board has taken no public position and no action to protect Circle from the competitive harm described in this Complaint.

148. Fourth, the directors' own careers and fortunes are bound up with companies that need the President's goodwill. Most of Circle's outside directors lead, sit on the boards of, or spent their careers at companies that gave money to the President's inauguration, depend on large federal contracts and regulatory approvals, or do business with the same Emirati interests at the center of this case, including Goldman Sachs, Microsoft, Amazon, and KKR. Those relationships are described director by director below.

149. Fifth, the President has shown, again and again, that he punishes those who cross him: law firms, news organizations, political opponents, and former allies. Every member of the Board knows it. "Causing a lawsuit to be brought against another person is no small matter, and is the sort of thing that might plausibly endanger a relationship."[31] Here, the relationship at risk is with the President of the United States and the government he controls.

150. Taken together, these facts create a reasonable doubt that a majority of Circle's directors could impartially consider a demand to sue the President. The more detailed allegations that follow, including the director-specific allegations, should be read in that light.

---

[31] *Sandys v. Pincus*, 152 A.3d 124, 134 (Del. 2016).

## N. Circle Aligned Itself with the President

151. After President Trump was reelected in November 2024, Circle sought a seat at the President's table. That month, Circle's Chairman and Chief Executive Officer, Jeremy Allaire, told the New York Times that he was interested in joining the President-elect's promised crypto advisory council. At the same time, Heath Tarbert, Circle's Chief Legal Officer and a former Chairman of the Commodity Futures Trading Commission, was reported to be among the industry executives advising the President-elect's transition team on how to put its crypto policies into action. Mr. Tarbert has since become Circle's President while remaining its Chief Legal Officer.

152. In January 2025, Circle publicly aligned itself with the incoming President when Mr. Allaire announced that Circle had donated $1 million in USDC to the Trump-Vance Inaugural Committee: "@circle has contributed 1M USDC to President Trump's Inaugural Committee. We are excited to be building a great American company, and the fact that the Committee took payment in USDC is an indicator of how far we have come, and the potential and power of digital dollars."[32] Each of Circle's current directors other than Mr. Koenigsbauer and Mr. Selipsky was a member of the Board at the time.

153. Mr. Allaire made clear that he expected quick action from the new administration. On January 20, 2025, Inauguration Day, he told Reuters that he expected executive orders from the incoming President "imminently," which he said could allow banks to trade and hold crypto.

154. In July 2025, President Trump signed the GENIUS Act, which created a federal regulatory structure for payment stablecoins like Circle's USDC. At the signing ceremony, the President recognized Mr. Allaire by name: "Jeremy Allaire of Circle. It's a big day. Good job.

[32] Jeremy Allaire (@jerallaire), X (Jan. 9, 2025), https://x.com/jerallaire/status/1877341550327332976.

Good job, Jeremy."[33] Mr. Allaire later credited the legislation for Circle's growth, telling investors on Circle's third-quarter 2025 earnings call: "We saw very strong growth in Q3. I think that growth has come from, yes, the regulatory clarity."[34]

155. On November 18, 2025, Mr. Allaire was a guest at the White House dinner the President hosted for Saudi Crown Prince Mohammed bin Salman. In a Fortune interview published the next month, he praised the administration: "I think it's [an] innovation-forward, technology-forward, entrepreneur-forward environment. And that's very positive, from my perspective. And so we're seeing that, and I give the administration a lot of credit for really seeing this as an innovation issue, not just a risk."[35]

**O. The Board's Fear of Reprisal**

156. President Trump's cryptocurrency dealings have unlawfully disadvantaged Circle, but the Board has not taken steps to protect Circle's interests, for fear of reprisal.

157. A director cannot impartially consider a demand where there is reason to suspect that the director would act "not because they felt it to be in the best interests of the company, but out of self-interest or a loyalty to, or fear of reprisal from," an interested party.[36] While a court will not assume that a powerful party would retaliate against directors who cross him, "when controllers actually make retributive threats, that fact has legal significance," and a party's "demonstrated

---

[33] Remarks on Signing the Guiding and Establishing National Innovation for U.S. Stablecoins (GENIUS) Act, 2025 Daily Comp. Pres. Doc. 778 (July 18, 2025).

[34] Aniket Verma, *Trump-Endorsed GENIUS Act Provided "Regulatory Clarity," Fueled Circle's Strong Q3, Says CEO Jeremy Allaire*, Benzinga (Nov. 13, 2025), https://www.benzinga.com/crypto/cryptocurrency/25/11/48825764/trump-endorsed-genius-act-provided-regulatory-clarity-fueled-circles-strong-q3-says-ceo-jeremy-allaire.

[35] *Circle CEO Jeremy Allaire Worked His Way Up from Selling Baseball Cards as a Kid to Having One of the Most Influential IPOs of the Year*, Fortune (Dec. 10, 2025), https://fortune.com/2025/12/10/leadership-next-circle-ceo-jeremy-allaire-ipo/.

[36] *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 989 (Del. Ch. 2007).

willingness to take retributive action" can be among the factors that together create a reasonable doubt about a director's ability to consider a litigation demand.[37] The President is not Circle's controlling stockholder. But the power he holds over Circle and its directors, and his demonstrated willingness to use it against those who cross him, far exceeds that of any controlling stockholder. Plaintiff's independence allegations rest on the particular professional and financial interests, regulatory proceedings, and instances of personal pressure alleged here. The President's demonstrated efforts to influence private employment and the administration's current scrutiny of institutions in which directors hold outside positions support the inference that personal concerns would compromise those directors' consideration of litigation concerning his own financial interests.

158. President Trump has demonstrated throughout his presidencies that he will retaliate against those who oppose him. A Reuters investigation identified at least 470 people, organizations, and institutions targeted for retribution during the President's second term, stating that "[i]n his second term, Donald Trump has turned a campaign pledge to punish political opponents into a guiding principle of governance."[38]

159. The President has punished law firms that represent clients adverse to him. In 2025, he targeted Covington & Burling by presidential memorandum and issued executive orders targeting Perkins Coie, Paul, Weiss, Jenner & Block, WilmerHale, and Susman Godfrey. Federal courts permanently enjoined the orders against Perkins Coie, Jenner & Block, WilmerHale, and

---

[37] *In re Ezcorp Inc. Consulting Agreement Derivative Litig.*, C.A. No. 9962-VCL, 2016 WL 301245, at *41–*42 (Del. Ch. Jan. 25, 2016).

[38] Peter Eisler et al., *Trump's Campaign of Retribution: At Least 470 Targets and Counting*, Reuters (Nov. 26, 2025), https://www.reuters.com/investigates/special-report/usa-trump-retribution-tracker/.

Susman Godfrey as unconstitutional; Paul, Weiss settled by agreeing to provide substantial pro bono work, and the President revoked the order against it.

160. The President has punished news organizations that report negatively about him. On September 19, 2026, the White House barred journalists from CNN, MS NOW, and Politico from White House grounds for reporting "FICTION" and "LIES" about "the President of the United States, the Trump Administration, or the United States of America," a ban a federal court has since temporarily lifted.

161. The President has used the Department of Justice and other federal agencies to retaliate against political opponents, including through investigations, arrests, and prosecutions.

162. Even a one-time ally is not safe. When Elon Musk criticized the President's signature legislation in 2025, the President responded by suggesting that the government reexamine the subsidies and contracts on which Mr. Musk's companies depend: "Perhaps we should have DOGE take a good, hard, look at this? BIG MONEY TO BE SAVED!!!"[39]

163. Each member of the Board has reason to fear personal consequences for authorizing litigation against the President. Several of Circle's directors hold senior positions at, or serve on the boards of, other corporations that depend on the federal government or could become targets of the President, including Bank of Montreal, Goldman Sachs, Anheuser-Busch InBev, Etsy, nVent Electric, Dover Corporation, Thomson Reuters, Microsoft, and Helix Digital Infrastructure. Their own personal interests would be at risk if they authorized litigation to defend Circle against the President's unlawful use of his presidency to gain advantage in the cryptocurrency market.

---

[39] Donald J. Trump (@realDonaldTrump), Truth Social (July 1, 2025), https://truthsocial.com/@realDonaldTrump/posts/114776149269773065.

**P. Circle's Dependence on the Administration and on Binance**

164. The Board's ability to consider a demand to sue the sitting President must also be evaluated in light of the Company's circumstances, which bear on every director.

165. Circle's entire stablecoin business will be regulated under the GENIUS Act, which the President signed and which takes effect on January 18, 2027. Circle's national trust bank, First National Digital Currency Bank, N.A., operates under a charter granted by the OCC, an agency headed by a Comptroller appointed by the President and removable by him upon reasons communicated to the Senate, *see* 12 U.S.C. § 2, with management of the USDC reserve deferred to a future phase that will require further regulatory action.

166. Circle is also commercially entwined with Binance, the recipient of the UAE's USD1, the principal venue on which USD1 is held, and the company whose founder the President pardoned. In addition to the 2024 strategic partnership and the $60.3 million upfront fee described above, Circle entered into a further agreement with Binance in August 2025 with a four-year term. On September 17, 2026, Circle and Binance entered into a new five-year commercial arrangement that superseded the earlier agreements, under which Circle pays Binance a monthly incentive fee. At the same time, Binance purchased 1,237,011 shares of Circle Class A common stock at $80.84 per share, a discount to the market price, for aggregate proceeds to Circle of approximately $100 million; Binance retains the right to vote those shares.

167. A lawsuit by Circle against the President over emoluments paid through USD1 and Binance would place Circle in direct conflict with the President, with the administration on which its charter and regulatory standing depend, and with Binance, its commercial partner and now its stockholder.

### Q. At Least Four of Circle's Seven Directors Lack Independence from President Trump

*1. Jeremy Allaire*

168. Jeremy Allaire co-founded Circle and has served as its Chairman and Chief Executive Officer since August 2013. The Board has determined that each of Circle's directors other than Mr. Allaire is independent under the listing standards of the New York Stock Exchange. Through Circle's Class B common stock, which carries five votes per share subject to a 30% cap on aggregate voting power, Mr. Allaire holds outsized voting power over the Company: 23.9% of the total voting power as of March 16, 2026. As reported in a Form 4 filed on October 7, 2026, he held 15,665,889 shares of Class B common stock directly and 296,296 more through a trust. Circle paid Mr. Allaire more than $16 million in total compensation for 2025.

169. Mr. Allaire's independence has been compromised by his pursuit of political favor from President Trump. As soon as the President was reelected in November 2024, Mr. Allaire sought direct access to him by pursuing a seat on the President-elect's crypto advisory council. Two months later, Mr. Allaire announced Circle's $1 million donation to the President's inaugural committee. When the President-elect named David Sacks as his crypto and artificial-intelligence adviser in December 2024, Mr. Allaire praised the appointment as "the White House implicit acknowledgment that Crypto and AI are the most strategic new tech areas for the United States and the world."[40] In July 2025, the President signed the GENIUS Act, establishing a regulatory structure for stablecoins like Circle's USDC, and recognized Mr. Allaire by name at the signing. Mr. Allaire has since attended a White House dinner for the Saudi Crown Prince and credited the administration publicly for Circle's regulatory environment.

---

[40] Jeremy Allaire (@jerallaire), X (Dec. 5, 2024), https://x.com/jerallaire/status/1864845039068729493.

170. While that legislation may benefit Circle in the short term, the cost is high. Mr. Allaire is vulnerable to a President who may, at any time, seek to cash in on his favor. Mr. Allaire lacks independence from President Trump, who has received and continues to receive material personal benefits from the conduct alleged in this Complaint.

*2. Craig Broderick*

171. Craig Broderick has been a member of the Board since June 2023 and has served as Circle's "Lead Independent Director" since June 2026. He was a member of the Board when Circle donated $1 million to the President's inaugural committee. Mr. Broderick served at Goldman Sachs from 1985 to January 2018, including as Chief Risk Officer from 2008 to January 2018, and currently serves on the board of directors of Bank of Montreal. Goldman Sachs & Co. LLC also donated $1 million to the President's inaugural committee. Mr. Broderick lacks independence from President Trump, who has received and continues to receive material personal benefits from the conduct alleged in this Complaint.

172. Mr. Broderick chairs Bank of Montreal's ("BMO") Risk Review Committee and serves on its Audit and Conduct Review Committee. The Risk Review Committee oversees risk-related regulatory compliance and approves the bank's Environmental and Social Risk Corporate Policy. BMO reported $370,000 (Canadian) in his 2025 director compensation, all taken in deferred share units. As of February 17, 2026, it reported 5,000 BMO shares and 22,534 deferred share units held by him, together valued at $5,312,135 (Canadian). His accumulated compensation therefore remains economically exposed to BMO's share value.

173. On October 14, 2026, the OCC identified BMO Bank among nine banks examined in its review under the President's debanking executive order. The report specifically described BMO's environmental and social financing restrictions involving firearms businesses, including a

policy contemplating the termination of relationships with customers who declined to meet BMO requirements. The same day, the Consumer Financial Protection Bureau announced that it would investigate compliance with federal consumer financial laws by the institutions featured in the report and take appropriate action.

174. Mr. Broderick knew of this scrutiny, given his committee chairmanship, the committee's responsibility for the pertinent policies and regulatory risks, and BMO's public identification immediately before this action. His continuing compensated outside position and his accumulated BMO investment gave him a personal professional and financial interest in avoiding additional conflict with the administration while that scrutiny was pending. This concern compromises his consideration of litigation directed to the President's own financial interests.

*3. M. Michele Burns*

175. M. Michele Burns has been a member of the Board since December 2013 and was on the Board when Circle donated $1 million to the President's inaugural committee. She currently serves on the boards of directors of the Goldman Sachs Group, Anheuser-Busch InBev, and Etsy. She previously served as Chief Executive Officer of the Retirement Policy Center from October 2011 to February 2014, and as Chairman and Chief Executive Officer of Mercer. Goldman Sachs & Co. LLC, a subsidiary of the Goldman Sachs Group, on whose board Ms. Burns sits, donated $1 million to the President's inaugural committee. Ms. Burns lacks independence from President Trump, who has received and continues to receive material personal benefits from the conduct alleged in this Complaint.

176. Ms. Burns's Goldman relationship is current and remunerative. Goldman reported $519,404 in her 2025 director compensation, comprising $100,000 in cash retainers, $349,404 in stock awards, and $70,000 in other compensation. As of March 2, 2026, Goldman reported 27,331

vested and restricted stock units for Ms. Burns. Delivery of shares underlying director awards is generally deferred until at least 90 days after retirement from the board. Her financial relationship with Goldman therefore includes accumulated deferred equity as well as current board compensation.

177. On August 12, 2025, President Trump publicly attacked Goldman Sachs's tariff analysis, urged Goldman Sachs Chief Executive David Solomon to replace the firm's economist, and criticized Solomon's leadership of the institution. The President thus directed personal public pressure at leaders of the financial institution that compensates Ms. Burns and in which she holds deferred equity. That conduct made concrete the possibility of presidential pressure on Ms. Burns's outside institutional connections related directly to her financial interests.

*4. Bradley Horowitz*

178. Bradley Horowitz has been a member of the Board since September 2024 and has served since July 2023 as a General Partner and co-founder of Wisdom Ventures. He previously served as Vice President of Product at Google from February 2008 to September 2023. He was a member of the Board when Circle donated $1 million to the President's inaugural committee. Mr. Horowitz lacks independence from President Trump, who has received and continues to receive material personal benefits from the conduct alleged in this Complaint.

*5. Kirk Koenigsbauer*

179. Kirk Koenigsbauer has been a member of the Board since March 2026. Since March 2026, he has been President and Chief Operating Officer of Microsoft's Experiences and Devices Group, focused on Microsoft 365 and Copilot. He also served on the board of directors of Thomson Reuters through at least June 10, 2026.

180. Microsoft depends heavily on the federal government and on the UAE. In September 2025, the General Services Administration announced a government-wide agreement with Microsoft, covering the Microsoft 365 and Copilot products Mr. Koenigsbauer now oversees, with potential savings to the government of $3.1 billion in the first year. Microsoft has a $1.5 billion equity investment in G42, the Abu Dhabi artificial-intelligence company chaired by Sheikh Tahnoon, which gives Microsoft a seat on G42's board. Microsoft was also the first company in 2025 to secure export licenses from the Commerce Department to ship GPUs to the UAE, approved in September 2025. In September 2026, Microsoft announced plans to invest more than $10 billion across the UAE and other Gulf states through 2030. Microsoft contributed $750,000 to the President's inaugural committee. At a September 2025 White House dinner, Microsoft's chief executive thanked the President "for bringing us all together, and the policies that you have put in place for the United States to lead."[41] Mr. Koenigsbauer lacks independence from President Trump, who has received and continues to receive material personal benefits from the conduct alleged in this Complaint.

181. On September 26, 2025, President Trump publicly demanded that Microsoft terminate the employment of its President of Global Affairs, Lisa Monaco. He connected the demand to her former Justice Department role in proceedings involving him and expressly invoked Microsoft's major federal contracts. Mr. Koenigsbauer holds a current senior executive position at that same employer, directing Microsoft 365 and Copilot, the products implicated in the federal commercial relationship above.

[41] Press Release, White House, *President Trump, Tech Leaders Unite to Power American AI Dominance* (Sept. 5, 2025), https://www.whitehouse.gov/releases/2025/09/president-trump-tech-leaders-unite-american-ai-dominance/.

182. The President's effort to secure the removal of another senior Microsoft officer because of her involvement in legal proceedings concerning him made the risk of personal professional pressure apparent to Mr. Koenigsbauer. Authorizing this action would require him to consider a comparable risk to his own continuing executive employment, in addition to effects on the business he directs. Plaintiff alleges that this personal concern would compromise his consideration of a demand.

*6. Danita Ostling*

183. Danita Ostling has been a member of the Board since October 2021 and was on the Board when Circle donated $1 million to the President's inaugural committee. She is a former partner of Ernst & Young and currently serves on the boards of directors of nVent Electric plc and Dover Corporation. Ms. Ostling lacks independence from President Trump, who has received and continues to receive material personal benefits from the conduct alleged in this Complaint.

*7. Adam Selipsky*

184. Adam Selipsky has been a member of the Board since July 2025. He served as Chief Executive Officer of Amazon Web Services from 2021 to 2024 and as President and Chief Executive Officer of Tableau Software from 2016 to 2021. He is now the co-founder and Chief Executive Officer of Helix Digital Infrastructure, an artificial-intelligence infrastructure company launched in June 2026 by the investment firm KKR, with anchor investors including the Kuwait Investment Authority, Nvidia, and Vistra. KKR contributed $1 million to the President's inaugural committee. Nvidia's chief executive was appointed to the President's Council of Advisors on Science and Technology in March 2026. And Amazon, which Mr. Selipsky served for most of his career, contributed $1 million to the inaugural committee, has been identified as a donor to the President's White House ballroom project, and holds substantial federal contracts, including a

government-wide agreement with the General Services Administration announced in August 2025. Mr. Selipsky lacks independence from President Trump, who has received and continues to receive material personal benefits from the conduct alleged in this Complaint.

### R. Demand Is Futile

185. Based on these facts, Directors Allaire, Broderick, Burns, Horowitz, Koenigsbauer, Ostling, and Selipsky could not impartially consider a demand that Circle pursue the claims asserted in this action.

186. Demand upon the Board would be futile and is therefore excused.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF THE FOREIGN EMOLUMENTS CLAUSE, U.S. CONST. ART. I, § 9, CL. 8 — THE MGX USD1 TRANSACTION

(derivatively on behalf of Circle, against President Trump in his official capacity, and against the Private Company Defendants as relief defendants)

187. Plaintiff repeats, realleges, and incorporates the above paragraphs as though fully set forth herein.

188. President Trump holds an Office of Profit or Trust under the United States and is subject to the Foreign Emoluments Clause.

189. MGX is an instrumentality of the government of Abu Dhabi and the UAE, and its acts are the acts of a "foreign State" within the meaning of the Foreign Emoluments Clause. MGX was created by an Abu Dhabi government council, is chaired by the deputy ruler of Abu Dhabi, and has as its vice chairman the chief executive of Mubadala, a sovereign investor owned by the government of Abu Dhabi.

190. By causing approximately $2 billion in USD1 to be issued and used to settle its investment in Binance, MGX conferred on World Liberty, and through World Liberty on President

Trump, a profit, gain, and advantage of far more than de minimis value, including the reserve income generated by the reserves backing that USD1, the increase in the value of World Liberty and the Trump family's interests in it, and the market credibility and distribution that came with a $2 billion foreign-State transaction.

191. MGX did so while two members of its board sat on World Liberty's board, and while MGX's chairman, through Aryam, co-owned World Liberty's stablecoin business.

192. President Trump has accepted, and continues to accept, that emolument through his financial interests in World Liberty, WLF Holdco, Stablecoin Holdco, DT Marks DEFI, DT Marks SC, and related entities, while in office. The President's 2025 financial disclosure reports net operating income from the stablecoin business that operates USD1.

193. Each of the Private Company Defendants is named as a relief defendant on this Count because it received, holds, or shares in the benefits of the MGX transaction. World Liberty and Stablecoin Holdco received and hold the reserve income generated by the USD1 issued for the MGX transaction. WLF Holdco, as World Liberty's sole member, receives World Liberty's distributions. DT Marks SC, through its 38.25% interest in Stablecoin Holdco, receives a share of the stablecoin business's income. Upon information and belief, DT Marks DEFI received World Liberty token-sale proceeds that the MGX transaction increased.

194. Congress has not consented to President Trump's acceptance of this emolument.

195. President Trump's acceptance of this emolument violates the Foreign Emoluments Clause.

196. The Foreign Emoluments Clause binds the President as officeholder, and he is sued in that capacity; the relief sought restrains only his acceptance of private financial benefits, which is not an exercise of executive power, and does not direct the performance of any official duty.

197. Circle has been and continues to be injured by President Trump's acceptance of this emolument, as described above. Circle's injury will continue unless the violation is enjoined.

198. Plaintiff incorporates the allegations of the section titled "Irreparable Harm, the Equities, and the Public Interest." Circle has no adequate remedy at law. The balance of hardships and the public interest favor the permanent injunctive relief requested.

199. Plaintiff, on behalf of Circle, is entitled to a declaration that President Trump's acceptance of this emolument violates the Foreign Emoluments Clause, to an injunction prohibiting President Trump from continuing to accept it without the consent of Congress, and to an accounting and disgorgement of the emoluments received from the Private Company Defendants, as set forth in the Prayer for Relief.

**COUNT II**
**VIOLATION OF THE FOREIGN EMOLUMENTS CLAUSE, U.S. CONST. ART. I, § 9, CL. 8—THE ARYAM EQUITY TRANSACTION**
(derivatively on behalf of Circle, against President Trump in his official capacity, and against the Private Company Defendants as relief defendants)

200. Plaintiff repeats, realleges, and incorporates the above paragraphs as though fully set forth herein.

201. Aryam, and the persons and funds that stand behind it, are, upon information and belief, owned or controlled by Sheikh Tahnoon in his capacity as an official of the government of Abu Dhabi and the UAE, or are instrumentalities of that government, and their acts are the acts of a "foreign State" within the meaning of the Foreign Emoluments Clause. Sheikh Tahnoon is the UAE's national security adviser and the deputy ruler of Abu Dhabi; the Delaware Aryam entity is managed by executives of G42, which he chairs, and the Abu Dhabi Aryam entity shares an office address with his other companies; and the empire through which he invests is funded by his personal fortune and state money.

202. Through the Aryam transaction, Aryam agreed to pay $500 million for a 49% interest in World Liberty, split between WLF Holdco and Stablecoin Holdco, including $187 million paid up front to Trump family entities, DT Marks DEFI and DT Marks SC.

203. Upon information and belief, payments under the Aryam transaction, and distributions and other benefits attributable to it, were received by President Trump and Trump family entities after January 20, 2025, while President Trump held office, including from the second installment of the purchase price, which was due by July 15, 2025. The President reported $262.5 million in 2025 proceeds from the sale of interests in WLF Holdco and Stablecoin Holdco, approximately $75.5 million more than the first-installment payments to DT Marks DEFI and DT Marks SC.

204. Each of the Private Company Defendants is named as a relief defendant on this Count because it received or holds the proceeds of the Aryam transaction or the interest Aryam acquired. Of the $250 million first installment, $187 million went to DT Marks DEFI and DT Marks SC. In 2025, DT Marks DEFI received at least $65,625,000 from the sale of equity in WLF Holdco, and DT Marks SC received at least $196,875,000 from new members' capital contributions to, and the sale of Class C units of, Stablecoin Holdco. DT Marks DEFI and DT Marks SC either continue to hold those proceeds or have distributed them to the Trust and the President. The Aryam transaction was effected through the sale of interests in WLF Holdco and Stablecoin Holdco, and World Liberty received the benefits that came with Aryam's investment.

205. The Aryam transaction is also a continuing arrangement. Upon information and belief, throughout the President's term, a vehicle of a senior UAE official has held 49% of the President's business and of the stablecoin business that receives the income on MGX's USD1, and

executives of G42, which that official chairs, have sat on World Liberty's board and overseen the USD1 project.

206. Upon information and belief, a foreign State also acquired, through StringZ Holding RSC, a 49% interest in the holding company of World Liberty's national trust bank, conferring further profit, gain, and advantage on World Liberty and, through it, on President Trump.

207. These payments and benefits were of far more than de minimis value.

208. Congress has not consented to President Trump's acceptance of these emoluments.

209. President Trump's acceptance of these emoluments while in office violates the Foreign Emoluments Clause.

210. Circle has been and continues to be injured by President Trump's acceptance of these emoluments, which capitalized and strengthened the President's competing stablecoin business, gave foreign-State insiders seats on its board, laid the groundwork for USD1 itself, and secured for it the advantages described above.

211. Plaintiff incorporates the allegations of the section titled "Irreparable Harm, the Equities, and the Public Interest." Circle has no adequate remedy at law. The balance of hardships and the public interest favor the permanent injunctive relief requested.

212. Plaintiff, on behalf of Circle, is entitled to the declaratory, injunctive, and equitable relief set forth in the Prayer for Relief.

## COUNT III
## INJUNCTIVE RELIEF, FOREIGN EMOLUMENTS CLAUSE, U.S. CONST. ART. I, § 9, CL. 8

(derivatively on behalf of Circle, against Steve Witkoff in his official capacity)

213. Plaintiff repeats, realleges, and incorporates the above paragraphs as though fully set forth herein.

214. Steve Witkoff is an officer of the United States and a subordinate of the President. As the President's Special Envoy to the Middle East, Mr. Witkoff conducts the President's dealings with the government of the UAE and its officials.

215. Steve Witkoff co-founded World Liberty with his son, Zach Witkoff, and members of the Trump family. In December 2024, after the President-elect chose him as envoy, he met with Sheikh Tahnoon in the UAE. Approximately one week later, the Aryam entities were formed. On March 18, 2025, Mr. Witkoff sat beside Sheikh Tahnoon at the White House dinner the President hosted for the Sheikh—while half of Aryam's purchase price remained unpaid and before MGX had settled its $2 billion investment in Binance.

216. Steve Witkoff kept a financial interest in World Liberty while serving as the President's envoy. Mr. Witkoff's financial disclosure, filed in August 2025, reported an interest in World Liberty, an interest that the White House said in September 2025 Mr. Witkoff was "still in the process of divesting." Mr. Witkoff later reported nearly $107 million in 2025 income from a World Liberty-affiliated holding company. Mr. Witkoff's son is World Liberty's chief executive officer and a manager of WLF Holdco, and is the individual who announced that USD1 had been selected to close MGX's investment.

217. Upon information and belief, Mr. Witkoff did not recuse himself from the administration's deliberations concerning the UAE, and he supported the administration's decision to permit the export of advanced AI chips to the UAE and G42 all while World Liberty received the benefit of MGX's $2 billion.

218. The government of the UAE and its instrumentalities have continued to confer benefits on the President's businesses while Steve Witkoff has served as envoy, including, upon

information and belief, the August 2026 acquisition by a vehicle linked to Sheikh Tahnoon of 49% of the holding company of World Liberty's national trust bank.

219. The Foreign Emoluments Clause forbids the President from accepting any present or emolument from a foreign state without the consent of Congress. An officer of the United States—like Mr. Witkoff—who solicits, on the President's behalf, a benefit the Clause forbids the President from accepting acts in furtherance of, and in concert with, the President's violation.

220. The relief Plaintiff seeks against Steve Witkoff is narrow. If granted, the relief sought would only bar Mr. Witkoff from soliciting, on behalf of the President or any entity in which the President holds a financial interest, a present or emolument from a foreign state or its instrumentalities, without the consent of Congress. The relief sought would not restrain the conduct of foreign policy or direct the performance or nonperformance of any official duty.

221. Circle has been and continues to be injured, and its injury will continue unless the Court enjoins Steve Witkoff. Circle has no adequate remedy at law, as alleged above, and the balance of hardships and the public interest favor the narrow injunction requested.

222. Plaintiff, on behalf of Circle, is entitled to the requested injunction.

**COUNT IV**
**DECLARATORY JUDGMENT, 28 U.S.C. §§ 2201–2202**
(derivatively on behalf of Circle, against President Trump in his official capacity and the Private Company Defendants)

223. Plaintiff repeats, realleges, and incorporates the above paragraphs as though fully set forth herein.

224. An actual, substantial, and continuing controversy exists between Circle, on the one hand, and President Trump and the Private Company Defendants, on the other, regarding whether President Trump's acceptance and receipt of the benefits described in this Complaint violates the Foreign Emoluments Clause.

225. The controversy is ripe. The emoluments described in this Complaint have been accepted and continue to be accepted, and Circle is suffering ongoing injury as a result.

226. A declaratory judgment will serve a useful purpose in clarifying and settling the legal relations at issue and will afford relief from the uncertainty and controversy giving rise to this proceeding.

227. Plaintiff, on behalf of Circle, is entitled to a declaration that President Trump's acceptance and receipt of the emoluments described in Counts I and II violates the Constitution, and to such further necessary or proper relief as the Court may order under 28 U.S.C. § 2202.

## COUNT V
## EQUITABLE ACCOUNTING, DISGORGEMENT, AND CONSTRUCTIVE TRUST
(derivatively on behalf of Circle, against the Private Company Defendants)

228. Plaintiff repeats, realleges, and incorporates the above paragraphs as though fully set forth herein.

229. The Private Company Defendants, through which the President accepted the emoluments, have received, and hold, money and property that constitute or derive from emoluments accepted in violation of the Constitution, including the proceeds of the Aryam transaction, reserve income attributable to the USD1 issued for the MGX transaction, and the proceeds of the sale of interests in WLF Holdco and Stablecoin Holdco.

230. None of the Private Company Defendants has a legitimate claim to the emoluments it received or holds. DT Marks DEFI and DT Marks SC did not acquire the Aryam proceeds through a bargained-for exchange that the Constitution permits: the equity they conveyed to Aryam was the means by which a foreign State's money reached the President. World Liberty, WLF Holdco, and Stablecoin Holdco have no legitimate claim to the portion of their revenues and distributions that is traceable to the foreign State transactions alleged in this Complaint. A payment

that the Foreign Emoluments Clause forbids the President to accept directly does not become lawful because he routes it through an entity he controls.

231. The amount and disposition of those emoluments are known to the Private Company Defendants and are not known to Circle. An accounting is necessary to determine them.

232. Equity will not permit the Private Company Defendants to retain the fruits of the President's unconstitutional acceptance of emoluments at the expense of competitors injured by it.

233. Plaintiff, on behalf of Circle, is entitled to an accounting of all emoluments received by President Trump and the Private Company Defendants, to the disgorgement of those emoluments, to the fullest extent allowed, to the United States Treasury, or as the Court directs, and to the imposition of a constructive trust over them and their proceeds pending disgorgement.

**COUNT VI**
**UNJUST ENRICHMENT**
(derivatively on behalf of Circle, against the World Liberty Defendants)

234. Plaintiff repeats, realleges, and incorporates the above paragraphs as though fully set forth herein.

235. The World Liberty Defendants received benefits at Circle's expense. Through the conduct alleged above, they received the reserves backing approximately $2 billion of USD1 issued for the MGX transaction, the income earned on those reserves, and the stablecoin demand, distribution, and market position that came with them. But for the President's acceptance of emoluments, some or all of that stablecoin demand, and the reserves and reserve income that came with it, would have gone to USDC and Circle.

236. World Liberty received those benefits directly, as the owner of the USD1 brand whose stablecoin business captures the reserve income. Stablecoin Holdco received those benefits

as the owner of World Liberty's stablecoin business, which reported millions of dollars in net operating income in 2025.

237. The World Liberty Defendants have not returned those benefits and continue to hold them. At the time of this Complaint, over $4 billion in USD1 is in circulation, the vast majority of it held on Binance, and the reserves backing it continue to generate income for World Liberty's stablecoin business.

238. It would be unjust for the World Liberty Defendants to retain these benefits. They did not obtain them by competing on the merits. They obtained them because USD1 offered foreign states and others a means of enriching the President in violation of the Foreign Emoluments Clause, while those states and Binance sought—and obtained—valuable official action from the President and his administration.

239. Plaintiff, on behalf of Circle, is entitled to restitution in an amount to be proven at trial.

**COUNT VII**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
(derivatively on behalf of Circle, against World Liberty)

240. Plaintiff repeats, realleges, and incorporates the above paragraphs as though fully set forth herein.

241. Circle had a valid, existing business relationship with Binance. Under that relationship, Binance agreed to adopt USDC "as a vital dollar stablecoin for their own corporate treasury," and Circle paid Binance a $60.3 million upfront fee plus monthly fees. Circle therefore had a commercially reasonable expectancy that the dollar stablecoins Binance held in its corporate treasury, including stablecoins it received as investment capital, would be USDC.

242. Circle also had a commercially reasonable expectancy that MGX's $2 billion investment in Binance would be settled in USDC. When MGX and Binance announced the investment, they said it would be paid in a stablecoin. USD1 did not yet exist. USDC had been issued since 2018, was backed by reserves held principally in a registered government money market fund, and was the stablecoin Binance had just adopted for its own treasury and for which it had just added new trading pairs. The reasons MGX later gave for choosing USD1—that it is "backed 1:1 by a conservative mix of U.S. dollar-denominated assets" and its "compliance history"—describe USDC, not USD1. In fact, USD1 had no compliance history at all.

243. World Liberty knew of Circle's relationship with Binance and of Binance's adoption of USDC, which the two companies announced publicly in December 2024. World Liberty worked closely with Binance: Binance engineers built USD1's technology, World Liberty hired a close friend of Binance's founder who had run a Binance stablecoin product, and a single lobbyist represented both companies. World Liberty also knew that MGX had announced that its $2 billion investment would be paid in a stablecoin before USD1 even existed.

244. World Liberty intentionally induced Binance and MGX not to use USDC for the MGX transaction, and to use USD1 instead. An executive who oversaw the MGX investment also advised World Liberty. In late April 2025, World Liberty co-founder Zach Witkoff met with Binance's founder at a private Binance summit in Abu Dhabi, attended by that executive and by the lobbyist who represented both Binance and World Liberty. The next evening, World Liberty began issuing the USD1 for the deal. At the time, Binance's founder was seeking a pardon from the President.

245. World Liberty continued to interfere after the MGX transaction. In December 2025, it arranged for Binance to convert the collateral backing Binance-Peg BUSD into USD1 and to

offer zero-fee trading on USD1/USDC pairs, which was designed to move holders out of USDC and into USD1.

246. World Liberty intentionally interfered with those relationships and expectancies by improper means, including by offering USD1 as a vehicle through which foreign states and others could confer benefits on the President in violation of the Constitution, and by leveraging the President's official power, including the prospect of a pardon and favorable regulatory treatment, to obtain the business. Among other things, World Liberty worked with Binance, which had built USD1's technology, to have MGX pay its $2 billion investment in USD1 rather than USDC; and World Liberty and Binance then steered further stablecoin business from USDC to USD1, including through the conversion of Binance-Peg BUSD collateral into USD1 and zero-fee USD1/USDC trading. World Liberty's interference was not justified or privileged. World Liberty did not win this business by competing on the merits.

247. As a result, Binance and MGX did not settle the MGX investment in USDC, and Binance received and held approximately $2 billion of USD1, not USDC, on its own platform. Binance has since held the large majority of USD1 in circulation.

248. As a direct and proximate result, Circle lost business it would otherwise have obtained, including reserve income on stablecoin holdings that went to USD1 instead of USDC, in an amount to be proven at trial. As one example, Circle lost the reserve income it would have earned on that stablecoin demand, approximately $70 million to $82 million per year on $2 billion, net of amounts Circle shares with distribution partners, for as long as that USD1 remains outstanding.

249. World Liberty's conduct was willful, malicious, and in conscious disregard of Circle's rights, entitling Circle to punitive damages.

**COUNT VIII**
**UNFAIR COMPETITION**
(derivatively on behalf of Circle, against the World Liberty Defendants)

250. Plaintiff repeats, realleges, and incorporates the above paragraphs as though fully set forth herein.

251. Circle and World Liberty are direct competitors. Each issues a fully reserved United States dollar stablecoin, each earns its revenue from income on the reserves backing its stablecoin, and each competes for the same holders, including exchanges, institutional investors, and corporate treasuries.

252. The World Liberty Defendants obtained MGX's $2 billion stablecoin business not by competing on the merits, but by commercial bribery: they gave persons who acted for MGX in that transaction a personal financial stake in World Liberty and its stablecoin business, and then received MGX's business through those same persons.

253. MGX acts through its board of directors and its executives. At all relevant times, MGX's board included Peng Xiao and Martin Edelman, and MGX's investment in Binance was overseen by an executive who was also an adviser to World Liberty. Each owed duties of loyalty to MGX in connection with its investment in Binance, including the choice of the stablecoin in which that investment would be paid.

254. In connection with the Aryam transaction, World Liberty and Stablecoin Holdco gave those persons things of value. Through the sale of equity in WLF Holdco and the admission of new members to, and the sale of Class C units of, Stablecoin Holdco, Aryam—an entity managed by G42 executives including Mr. Xiao and Mr. Edelman—received a 49% interest in World Liberty's business, including its stablecoin business. Mr. Xiao and Mr. Edelman received seats on World Liberty's five-person board. And a G42 executive was installed as World Liberty's

chief strategic adviser and given oversight of the USD1 project. Upon information and belief, Mr. Xiao and Mr. Edelman hold or share in the economic interests that Aryam acquired.

255. These interests were concealed. The Aryam transaction was not disclosed to the public for more than a year. Upon information and belief, Mr. Xiao's and Mr. Edelman's interests in World Liberty and its stablecoin business were not disclosed to, or approved by, MGX's other directors or its foundational partners, including Mubadala, whose chief executive is MGX's vice chairman.

256. The World Liberty Defendants conferred these interests with the intent to influence the decisions of MGX's directors and executives in relation to MGX's affairs, including the choice of the stablecoin in which MGX would pay for its $2 billion investment in Binance. The timing shows it. Aryam's agreement was signed on January 16, 2025. MGX announced on March 12, 2025 that its investment would be paid in a stablecoin. USD1 did not exist until World Liberty announced it thirteen days later. On May 1, 2025, World Liberty announced that USD1 had been selected to close the transaction.

257. MGX's choice of USD1 cannot be explained on the merits. MGX later said it chose USD1 for its "compliance history," but USD1 had none: it had not been launched when MGX announced the investment. People close to the transaction privately expressed confusion about the choice. USDC, by contrast, had been issued since 2018, was backed by reserves held principally in a registered government money market fund, and was the stablecoin Binance had adopted for its own corporate treasury months earlier.

258. The bribe paid for itself. The reserves backing the USD1 that MGX purchased generate income for World Liberty's stablecoin business, which Aryam co-owns, so a share of the

income from MGX's own $2 billion flows back to the entity through which MGX's directors hold their interest in World Liberty.

259. The World Liberty Defendants also obtained stablecoin business through Binance by means other than competition on the merits. Binance asked MGX to pay in USD1 while its founder sought a pardon from the President, and after the MGX transaction it moved further stablecoin business from USDC to USD1.

260. As a direct and proximate result, Circle lost stablecoin business it would otherwise have obtained, including reserve income on the $2 billion of stablecoin demand created by the MGX transaction. At Circle's reserve return rates, that income would have been approximately $70 million to $82 million per year. Circle's injury is ongoing for as long as the USD1 issued for the MGX transaction remains outstanding.

261. The World Liberty Defendants' conduct was willful, malicious, and in conscious disregard of Circle's rights, entitling Circle to punitive damages.

262. Plaintiff, on behalf of Circle, is entitled to compensatory damages, an accounting and disgorgement of the profits the World Liberty Defendants obtained through their unfair competition, and punitive damages, in amounts to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, derivatively on behalf of Circle, respectfully requests that the Court enter judgment in Circle's favor and against Defendants, and award the following relief:

1. A determination that this action is a proper derivative action maintainable under Federal Rule of Civil Procedure 23.1, that Plaintiff is an adequate representative of Circle, and that demand on Circle's Board of Directors is excused;

2. A declaration that President Trump's acceptance of the emoluments described in this Complaint, without the consent of Congress, violates the Foreign Emoluments Clause, U.S. Const. art. I, § 9, cl. 8;

3. An injunction prohibiting President Trump from accepting, directly or through World Liberty, WLF Holdco, Stablecoin Holdco, DT Marks DEFI, DT Marks SC, or any other entity in which he holds a financial interest, any further emolument from a foreign state, including reserve income attributable to USD1 issued to or for a foreign state or its instrumentalities and payments or distributions attributable to the Aryam transaction, without first obtaining the consent of Congress, and requiring the Private Company Defendants to segregate such income pending further order;

4. An injunction prohibiting Steve Witkoff, in his official capacity, from soliciting, on behalf of President Trump or any entity in which President Trump holds a financial interest, any present or emolument from a foreign state or its instrumentalities, without the consent of Congress;

5. An order requiring President Trump and the Private Company Defendants to provide a full accounting of all payments, income, and other benefits received from any foreign state, or any instrumentality of a foreign state, in connection with World Liberty, USD1, WLFI, WLF Holdco, WLTC Holdings, or Stablecoin Holdco;

6. An order requiring the Private Company Defendants to disgorge all emoluments received in violation of the Constitution, and their proceeds, to the United States Treasury or as the Court directs, and imposing a constructive trust over those emoluments and proceeds pending disgorgement;

7. Compensatory damages against the World Liberty Defendants in an amount to be proven at trial;

8. Restitution against the World Liberty Defendants in an amount to be proven at trial;

9. Punitive damages against the World Liberty Defendants as permitted by law;

10. Pre-judgment and post-judgment interest as permitted by law;

11. An award to Plaintiff of his reasonable attorneys' fees, costs, and expenses, including under the common-fund and substantial-benefit doctrines; and

12. Such other and further relief as the Court deems just and proper.

## **JURY TRIAL REQUESTED**

Plaintiff requests a trial by jury on all claims and issues so triable.

Dated: October 22, 2026

Respectfully submitted,

*/s/ Karianne M. Jones*

Karianne M. Jones (D.C. Bar 1177335)
Matt Pelikan (*pro hac vice* forthcoming)*
Hannah Warntjes (*pro hac vice* forthcoming)*
Evergreen Legal Strategies LLP
1763 Columbia Rd NW, Suite 100
Washington, D.C. 20009
(202) 430-6568
karianne@evergreenlegalstrategies.com
matt@evergreenlegalstrategies.com
hannah@evergreenlegalstrategies.com

*Attorneys for Plaintiff*

*Practicing under the supervision of members of the D.C. Bar.

**VERIFICATION**

I, J. Benjamin Greenberg, declare as follows: I am the Plaintiff in this action and a stockholder of Circle Internet Group, Inc. I have read the foregoing Verified Stockholder Derivative Complaint. The allegations concerning me and my own acts are true of my own personal knowledge. As to all other allegations, I believe them to be true based on the investigation of my counsel. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 21, 2026 at Jefferson County, Colorado.

*/s/ J. Benjamin Greenberg*
J. Benjamin Greenberg